Opinion by Judge RAWLINSON; Concurrence by Chief Judge KOZINSKI; Dissent by Judge TALLMAN.
OPINION
RAWLINSON, Circuit Judge:
This case emerged from a horrendous crime — the murder of nine individuals, including six monks, inside a Buddhist temple. The ensuing investigation ensnared Petitioner Jonathan Doody, a seventeen-year old high school student. Although Doody eventually confessed to participating in the nine murders, he challenged his confession, asserting that the Miranda[1] advisements he was given were inadequate and that his confession was involuntary. In our opinion reported at 596 F.3d 620 (9th Cir.2010) (en banc), we agreed on both counts. Specifically, we concluded that the advisement provided to Doody, which consumed twelve pages of transcript and completely obfuscated the core precepts of Miranda, was inadequate. We also held that nearly thirteen hours of relentless overnight questioning of a sleep-deprived teenager by a tag team of officers overbore the will of that teen, rendering his confession involuntary. See id. at 622-23. We concluded that the state court rulings to the contrary were an unreasonable determination of the facts and an unreasonable application of governing Supreme Court precedent. See id. at 636, 653. The United States Supreme Court granted certiorari, vacated our judgment and remanded this case to us for further consideration in light of Florida v. Powell, — U.S. --, 130 S.Ct. 1195, 175 L.Ed.2d 1009 (2010). See Ryan v. Doody, — U.S. -, 131 S.Ct. 456, 178 L.Ed.2d 282 (Oct. 12, 2010) (Mem.). Having reviewed the facts and circumstances of this case in light of Powell, we reaffirm our prior rulings.

I. BACKGROUND

“On the morning of August 10, 1991, members of the Wat Promkunaram Buddhist Temple discovered nine bodies inside the temple (the temple murders). The victims, including six Buddhist monks, lay face down in a circle, each shot in the head.” State v. Doody, 187 Ariz. 363, 930 P.2d 440, 443 (Ariz.Ct.App.1996). Temple living quarters were ransacked, and personal property was missing. See id.
*991 Approximately one month after the temple murders, Phoenix detectives received an anonymous tip implicating four men from Tucson (the Tucson Four). During interrogations, the four suspects made inculpatory statements, resulting in murder charges against them.[2] See id.
The police identified the murder weapon as a Marlin Model 60.22 caliber rifle (Marlin rifle). See id. Investigators received a report from Luke Air Force Base that a military policeman had discovered a Marlin rifle while searching a vehicle in an unrelated incident. See id. The rifle was recovered from its owner, Rolando Caratachea (Caratachea), and identified as the temple murder weapon. See id. When confronted, Caratachea denied involvement in the temple murders. He steered the investigators to Doody and another minor, Alessandro Garcia (Garcia), whom he reported had borrowed the rifle shortly before the murders. See id.
Police officers approached Doody on October 25, 1991, at a high school football game, where Doody was participating in a flag ceremony as a member of the high school Reserve Officers Training Corps (ROTC). Doody voluntarily accompanied the police officers to the station for questioning.
Doody’s interrogation began at 9:25 p.m. and concluded at 10:00 a.m. the next day. See id. at 444. Prior to commencing the interrogation, Detective Riley purported to advise Doody of his constitutional rights as required by Miranda. His recitation of Miranda’s basic warnings consumes twelve pages of transcript, largely a byproduct of the detective’s continuous usage of qualifying language. The Miranda form designed to be used when questioning juvenile suspects contained the following uncomplicated advisements:
1. You have the right to remain silent. (This means that you do not have to talk to me or answer any questions about this offense. You can be quiet if you wish.) ...
2. Anything you say can and will be used against you in a court of law. (This means that anything you tell me, I can use later against you in court ...)
3. You have the right to have an attorney present prior to and during questioning. (This means, if you want one, you are allowed to have a lawyer here before and during my questions to you ...)...
4. If you cannot afford an attorney, you have the right to have one appointed for you prior to questioning. (This means if you do not have the money to get a lawyer, if you wish, one will be given to you free of charge before you are questioned.) ...
Juvenile Miranda Warnings Form (October 25, 1991). What began as the reading of a single-page Miranda form morphed into a twelve-page exposition that negated the intended effect of the Miranda warning.
Detective Riley began by informing Doody that the warnings were merely a formality that Doody should not take out of context:
Ah, what I’d like to do first though Jonathan since we’re in kind of a formal setting and things like that and because DAVE [Munley’s] a police officer and I’m a police officer and things like that ah sometimes some of the questions that we get into are, are a little bit sensitive and ah things like that. Ah, and what I’d like to do is before we, we go into that is ah, read something to you ah, and *992 so that you understand some of the protections and things that ah, that you have. It’s not meant to scare you or anything like that, ah, don’t, ah, don’t take it out of context, okay.
Ah, I’m sure you’ve heard this thing and you’ve heard it said on t.v. and things like that and it’s not quite like t.v. portrays it ah, it’s a little more, little less technical and a little less heavy if you want to put it ah that way ... What, what, it’s called is a Miranda warning okay. Have you heard that before? Doody: No.
They call it Rights on t.v., okay. What, what that is and basically all that is Jonathan is, it’s not necessarily something that is, like on t.v. where they portray it when somebody’s ah guilty of doing something, ah, we read these things to people on somewhat of a regular basis, whether they’re responsible for doing something or not, okay. So I don’t want you to feel that because I’m reading this to you that we necessarily [sic] that you’re responsible for anything, it’s for your benefit, it’s for your protection and for our’s [sic] as well, okay?
Doody Interrogation Transcript, Tape 1, pp. 2-4 (emphases added).
Detective Riley then informed Doody that he was reading the Miranda warnings verbatim from a form. See id. at p. 8. However, the detective deviated significantly from the form, while informing Doody of his right to counsel. He stated:
Okay, and the next one states that you have the right to have an attorney present prior to and during questioning, and what that means [sic] that if you want one, you’re allowed to have a lawyer here before and during you know my questions to you, okay. And then an attorney is a lawyer who will speak for you and help you concerning the crime or any kind of offense that ah we might think that you or somebody else is involved in, if you were involved in it, okay. Again, it [sic] not necessarily mean that you are involved, but if you were, then that’s what that would apply to okay.
Id. at p. 10.
The interrogation commenced with casual questions from both Detective Riley and Detective Munley about Doody’s roommates and friends, including whether any of them owned guns. Doody volunteered that his friend Caratachea owned a gun, but denied that he ever borrowed or shot the gun. The two detectives then switched the focus of the questions to the temple murders, asking Doody to detail his whereabouts at the time of the murders and to describe how he became aware of the crime. Doody responded that on the night of the murders, he went to a movie with a friend and returned home. The two officers followed up by asking additional questions about the temple, Doody’s prior visits to the temple and the victims.
Approximately one hour into the interrogation, Detective Riley paused to lecture Doody about the importance of telling the truth. He also asked -a pointed question: whether Doody or anyone Doody knew had ever borrowed Caratachea’s rifle. Doody denied that he had, but stated that Garcia might have done so. At that point, Detective Riley apprised Doody that there were some things about the gun that he knew Doody was aware of, and he urged Doody to come clean.
Detective Riley again asked Doody about his whereabouts when the murders occurred and whether he knew anything about the murders other than what was reported in the news. When Doody once more denied any knowledge of the murders, Detective Riley repeated his warning about the importance of Doody telling all, *993 and he informed Doody that the detectives knew Doody was lying when he denied borrowing Caratachea’s rifle. In response, Doody reiterated that he never borrowed the rifle, but Garcia might have.
Following Doody’s repeated negative response to the question of borrowing Caratachea’s rifle, both detectives proceeded to lecture Doody on the importance of his telling the truth. In the midst of the lecture, the two detectives confronted Doody with their “knowledge” that Doody and at least one other person borrowed the rifle. They demanded information confirming their knowledge, telling Doody that “its [sic] so important for you, for you to tell us. I mean you have to tell us. You have to.” Doody Interrogation Transcript, Tape 3, p. 27 (emphasis added).
Almost immediately after the two detectives told Doody he had to tell them about borrowing the rifle, Doody obliged. He told the two detectives that he and Garcia borrowed the rifle well before the temple murders. This admission prompted several more sternly couched lectures on the importance of telling the truth, and the detectives’ knowledge that Doody was lying. The detectives also increased the pressure on Doody by informing him that Caratachea’s rifle was the murder weapon. Nevertheless, Doody maintained that he returned the rifle to Caratachea prior to the murders. He continued to deny knowledge of, or involvement in, the murders in the face of repeated questions and accusations that he was withholding information from the detectives.
In the middle of the night, Doody became virtually non-responsive to the detectives’ questioning, even though a third detective, Detective Sinsabaugh, who had interviewed Doody in September, joined the tag team. From that point, the pressure intensified. Detective Riley began with:
Why if you didn’t kill anybody, then what is what is keeping you from making people understandable [sic] believe that. ‘Cause if you didn’t kill anybody, doing what you’re doing right now isn’t going to convince anybody ... They’re gonna say and this is only speaking it out common sense fashion how people normally perceive things, is it if you didn’t kill anybody why is he lying, why won’t he tell what happened, there is [sic] got to be a reason for that; and the reason that most people would come to is that you probably kill [sic] them and it is won’t admit it. So we can get pass [sic] that point and deal with the fact that he didn’t kill anybody, but this is why your problem in coming across with what he knew and reasons were this and this and hey! I think there [sic] a probably pretty good reasons [sic] otherwise you wouldn’t have such a problem Jonathan, but help us understand that, and by understanding it you’re going to help yourself out tremendously ‘cause we have to know. Com’mon!
Doody Interrogation Transcript, Tape # 8, pp. 1-2. Doody responded, “I don’t know anything else.” Id. at p. 2.
Detective Sinsabaugh chimed in: “You know me don’t you Jonathan? How’ya doing my friend?” Id. at p. 6. The detective instructed an unresponsive Doody:
Remember we talked about honor. I need your help on this one. I know what’s up. I need you to help on this one, okay? You got a duty to help us Jonathan; I know exactly what went down, my man, and you got a duty to help us and we can work this thing out together and I’m coming to you straight up Jonathan. I’m serious. These guys [the other two detectives] are trying to give you an opportunity Jonathan for you to help us to be on our team and that’s why they’re spending this time *994 with you. Just like that night I talked to you, it’s no game now Jonathan. I know you though Jonathan, I know ... your family. I know where you have been raised, and I don’t think Jonathan Doody is a cold blooded killer. These guys were cowards Jonathan. You got mixed up with some dumb punks, and you gotta help us on this Jonathan. You gotta help us on this ‘cause it’s no game now. I mean that you gotta help us on this. This is not a game; I’m not playing with you Jonathan. I know your family and everything. Please help me on this Jonathan. We can we can talk and we’d see how we can ever work this thing out, but you gotta be straight up front with me. If if you lie to us Jonathan, then we’re not gonna be able to believe the truth. If you lie to us, I’m not gonna be able to believe whether or not you are [sic] killer and I don’t believe that Jonathan and that’s why I took the time to come in and talk to you, ‘cause I care about you man. Let it out, Jonathan. Now is the time let it out. Let it out, Jonathan. Tell’s [sic] us what’s up; take some pride in yourself we’ll, we’ll work it out Jonathan, but it’s not gonna help leaving it in. I need to know your part; we already know what went down Jonathan. Help me on this one.
Id. at pp. 6-7 (emphases added).
Besides reiterating that he didn’t do anything, Doody was non-responsive. The three detectives continued in tandem:
Detective Munley: Tell us what happened. We gotta hear it from you. Get it all cleared up Jonathan, you can do it. It has to come out Jonathan.
Detective Sinsabaugh: Jonathan now is the time.
Detective Munley: Go ahead Jonathan please. You’re not afraid to take stands, just get it out, just get it out ...
Detective Munley: Do it Jonathan; I can help you. Let it out Jonathan.
Detective Sinsabaugh: Trust me on this one. Jonathan. Whose plan was it Jonathan? Tell me Jonathan, whose plan was it? I’ll work with you on it. Go ahead, Jonathan, go ahead. Help us on this.
Detective Riley: Jon you can do it. Whose idea was it?
Detective Sinsabaugh: Jonathan let it out, let it out take a deep breath let it out now. Let it out and tell us what happened.
Now is the time, let it out. Get it out of you, it’s a new beginning for you.
Jon, this is bull shit. Get it out Jonathan ‘cause then I’m not gonna believe you when you do tell us we, we know what’s up. Now let it out now, and we’ll work together on it.
Detective Munley: Jonathan, who are we talking about here? You gotta take this position now. You better take a hold of this now.
Detective Riley: This is your time, Jon. This is your opportunity get [sic] it out. Detective Sinsabaugh: Jonathan, I know you’re involved. I don’t wanna go out that door; I don’t wanna believe other one’s, other people’s story. I want it from you first hand. Jonathan, it’s time. I’m serious, it’s time.
Take a stand. Be a man ...
Detective Riley: You have to ...
Detective Sinsabaugh: Now come clean with me Jonathan; come clean.
*995 Detective Munley: Rollie was involved, wasn’t he?
Detective Riley: Com’mon Jonathan, it’s not that difficult. Either he was or he wasn’t. Was he? Was he or wasn’t he involved? Jonathan was he?
Doody: I don’t know.
Detective Riley: Yes, you do know. Was he? Detective Sinsabaugh: Jonathan, I’m going out this room. I’m gonna talk to other people. I thought for surely [sic] I could come to you; you’re not thinking in your interest Jonathan. How we talked about the honor; I don’t see any of that honor my man.
Detective Riley: Try, you can do it. Gotta get it, you gotta release it Jonathan. It’s not gonna go away. Man you gotta get it out. Just go ahead and say it. It’s all in [sic] the tip of your tongue. Just let it out Jon ... [W]as Rollie involved? Jonathan it’s not that hard. Either he was or wasn’t. Com’mon, do it. Do it now. Either he was or he wasn’t. Was he involved? Yes or no? Com’mon, com’mon! ...
Detective Munley: Get it out ...
Detective Sinsabaugh: I’m with you. I’m with you. You gotta help me on this one. We gotta make this right Jonathan. This’s no game Jonathan; I’m being honest with you.
Detective Munley: He was involved, wasn’t he Jon?
Detective Sinsabaugh: It’s your side of the story.
Detective Munley: He was, wasn’t he.
Detective Sinsabaugh: Com’mon Jonathan.
Detective Munley: Jonathan, look at me; he was, wasn’t he? Go ahead Jonathan.
Detective Sinsabaugh: You were involved Jonathan. You were involved.
Detective Munley: We gotta know the extent of your involvement. We gotta have your version Jon.
Detective Sinsabaugh: Man, you gotta get it out.
Detective Munley: Tell it, Jon.
Detective Riley: Jonathan can you honestly sit there and tell myself and Dave and Rick right now that you were not at that temple.
Detective Sinsabaugh: No, ‘cause Jonathan Doody doesn’t lie.
Detective Munley: Jonathan, can you?
Detective Riley: Com’mon this is not that hard. You know what we’ve talked about throughout this whole conversation. If you’re there, we can deal with that; but we gotta know, we gotta hear it from you. You have to tell us. Yes or no? Were you or weren’t you? Yes or no? Jonathan, com’mon. Yes or no? Yes or no? Yes or no? Yes or no? It’s real simple. Were you or weren’t you. Just tell me, yes or no. Com’mon yes or no, it’s real simple.
Detective Sinsabaugh: Join the team. Let’s work this thing out together. I’m not gonna tell you, you can’t Jonathan. Let’s straighten this shit up.
Doody: (Murmur)
Detective Sinsabaugh: Jonathan do it.
Detective Riley: We have to know; you have to let us know. If you don’t, let us know know [sic] body else is gonna do that for you. Either you tell us you were or weren’t, it’s really simple. I know it’s a struggle right now, but you have to let us know that. Whether or not you were there. Simply yes or no. What is it, which one is it? Com’mon, take control right now.
*996 Detective Sinsabaugh: Answer Jonathan, answer.
Detective Munley: You can do it Jon.
Detective Munley: Jon, it’s not the end of the world. It’s not the end of the world.
Jonathan you can do it.
Detective Riley: Please! Jonathan, com’mon. You can deal with this; you can take control of this situation. The way to start with that is to do this now by telling us whether or not you were there. Were you or not there? Jonathan Please tell us now. Let us help you ... ■
Detective Munley: Get it out ...
Detective Riley: Give us the opportunity-
Detective Munley: Get it out. Go ahead.
Detective Riley: Grab a hold of this opportunity. Let us help you. Like Rick’s been telling you, trust us. Detective Sinsabaugh: Jonathan, Jonathan, Jonathan look at me. This is flat out bull shit man. What what what what’d, you been brought up better than this. What the hell does this stand for, Okay? Are you gonna cover for bunch [sic] of cowards. I’m trying to convince these people Jonathan that you didn’t kill anybody. You got something in here, and you you’re sitting here playing a game and I’m not gonna put up with it. You’re gonna sit there and cover for bunch [sic] of cowards. I think Jonathan, I’d come to you straight up and I’m gonna give [sic] chance to answer and I want you to come clear with this. Don’t cover for these guys. They’re cowards, Jonathan. Tell me.
Doody: I can’t.
Detective Sinsabaugh: Why? I’ll work with you, why? Why Jonathan? Why? Talk to, I’d talk to you the other night Jonathan; we can talk. Me and you can talk Jonathan ... don’t freeze up on me man. You freeze up on me like this, I can’t talk to you. Talk to me. Why can’t you and we’ll work it out. Just sit down and discuss this.... Jonathan, take charge man. Your [sic] soldier man, you don’t, you you don’t you can say what’s on your mind and tell me Jonathan. Tell me. Tell me so I can work this out with you. Go ahead my man, tell me. Tell me, trust me my man. Trust me. Trust me so we can work [sic] out; I need your help Jonathan. How did you get involved in it and talk. How did you get involved in it? We’ll work it out Jonathan, we’ll work it out. I’m worried about your family, too. We’ll work it out. You need to help me Jonathan. Jonathan, Jonathan don’t. You told me you can’t, now why? Jon no, Jonathan tell me. Why? Let’s work it out together. Jonathan look at me my man, trust me on this. Let’s work this thing. Why? If you wanna say it Jonathan, why? Why? 11 care about you Jonathan; you’re [sic] family wanna know why ...
Id. at pp. 10-19.
Between 3:15 a.m. and 3:56 a.m., after making a brief comment about there not being a threat to his family, Doody Interrogation, Tape 9, p. 1, Doody again became silent. The detectives continued without any response from Doody:
Detective Sinsabaugh: Jonathan, who did they threaten [sic] let it out? I know what’s up Jonathan. Tell me about it lets [sic] work this out. Jonathan I need your help to prove that your [sic] not a killer Jonathan. You went there it went to shit Jonathan it wasn’t your idea. You just got messed [sic] with the wrong guys, Jonathan look at me. Don’t sst [sic], what’s the problem? Jonathan tell me. Let it out, who, you *997 said not me who? Who Jonathan? Jonathan be a man about this. Tell me. Detective Riley: Who’s [sic] ideal [sic] was it Jonathan?
Detective Sinsabaugh: Tell him Jonathan. Tell him Jonathan, who’s [sic] ideal [sic] it was. Let’s get this out, there you go ...
Detective Sinsabaugh: Ideal [sic] was it? Detective Munley: Go ahead Jonathan. It’s easy, who’s [sic] ideal [sic]? Let it out Jonathan. Go ahead.
Detective Sinsabaugh: Jon, Jon, Jon trust me on this, Jonathan. It’s the only way we can work it out is if you’re up front Jonathan. Now I talked to you tonight, the other time we talked you you you intelligent [sic] help us on this talk to us.
Detective Munley: Who’s [sic] idea was it Jonathan?
Detective Sinsabaugh: Jonathan I’m gonna have to leave the room are you gonna help me on this? Are you gonna trust me on this? You can’t trust those guys. You can trust me now tell me Jonathan. Jonathan you’re wasting time, now tell me. You want to tell us, so let’s just tell it now.
Detective Munley: Tell Jonathan.
Detective Sinsabaugh: Jonathan, Jonathan who’s [sic] ideal [sic] was it? Jonathan you just said it, who’s [sic] ideal [sic] was it?
Detective Munley: OK Jonathan.
Detective Sinsabaugh: You’re gonna cover for a cold blooded killer?
Detective Munley: Jon go ahead and let it out. Go ahead Jon.
Detective Sinsabaugh: Jon Jon Jon Jon are you gonna cover for a cold blooded killer, now let it out.
Detective Munley: Go ahead Jon. Get it out Jon. Were you there? Jon.
Detective Sinsabaugh: Jon Jon tell tell me so I know what we’re up against. Why are you scared to tell us? Huh, Jon Jon you got to answer me why are you scared to tell us, answer me. No Jon why are you scared to tell us? I’m not gonna let you do this to yourself, why are you scared to tell us? No, Jon you’re gonna answer me, why are you scared to tell us? I’m concerned about ya and I’m I’m gonna stay here until I get an answer, why are you scared to tell, let me help you on this Jon. Jon, why are you scared to tell us? Huh? Jon, Jon answer me. Why are you scared to tell us, I’m not gonna let you do this. Now you you start talking to me. Tell us Jon. Jon Jonathan tell us.
Detective Munley: Let it go. You just said it.
Detective Sinsabaugh: Trust me on this [Jonathan]. This is the only way.
Detective Munley: Go ahead Jon. Get it out Jon, just get it over with it has to come out. It has to come out, go ahead. Go ahead Jon.
Detective Sinsabaugh: Jon look what you’re holding inside you want to tell us just tell us. Jon, Jon would you tell me? Look at me Jon, Jon don’t look away, look at me Jon you’re a soldier tell me what’s up. Jon no no no tell me Jon talk to me Jon. Jon no no this guy it’s not you’re not gonna cut it that way man, you’re gonna be a man about it. You’re gonna talk to me Jon.
Detective Riley: Who are you afraid of Jon?
Detective Sinsabaugh: You you gonna get this out in the open now Jon that isn’t going to buy it, you’re you’re you’re an ROTC you’re a soldier now start talking to me Jon don’t sit there like that talk to me. Jon you remember what’s my name? What’s my name? What’s my name Jon? What is my name? What is my name Jon?
Detective Riley: Don’t you remember his name?
*998 Detective Sinsabaugh: Do you remember me talking to you at school? I called you at school, your counselor and you called me? Do you remember yes or no?
Doody: Yes.
Detective Sinsabaugh: OK, why is that so hard? Yeah I talked to him a couple of months maybe. Jon Jon do you want to talk or not?
Doody: I’ll pull up a chair.
Detective Munley: Just get it out.
Detective Sinsabaugh: Jon, excuse me. What’s the deal are you gonna talk to me or not? Who am I Jon? What’s my name? Well talk, what is my name Jon? You can’t remember it? You remember me talking to you?
Doody: Yes.
Detective Sinsabaugh: OK speak up OK we’re men now. Could you remember me talking to you?
Doody: Yes.
Detective Sinsabaugh: OK speak up, Jon. OK I’m talking you [sic] straight up like a man, do you remember me talking to ya?
Doody: Yes.
Detective Sinsabaugh: OK I, you need to speak up through [sic] when you’re talking to me. WJiat is my name? You you remember my name? Yes or no, do you remember my name?
Doody: Yeah.
Detective Sinsabaugh: OK, what’s my name?
Doody: Richard Sinsabaugh.
Detective Sinsabaugh: Well why is that so hard? I’m I’m here for ya, you got to talk, why why you act [sic] that you don’t talk like that? Tell us these guys are trying to help you now what’s up? Jonathan, that’s it were [sic] talking now. Now, I know you’re involved Jonathan now now you gonna help me on this thing. So what’s the deal, what don’t don’t start this stuff talk to me OK, lets [sic] talk about the problem what problem are we having right now? What’s the problem? You say you’re afraid of something, what are you afraid of?
Doody: I’m not afraid of anybody.
Detective Sinsabaugh: OK what’s the problem talk to me that’s what we need to talk about what’s the problem? You’re afraid of the family? Right?
Doody: No.
Detective Sinsabaugh: What? Talk to me that’s what I need, so I can discuss it with ya what? Then what? Jon tell me, what?
Doody: I’m afraid for somebody.
Detective Sinsabaugh: Oh, are you afraid Vickie find [sic] out about you? What are you afraid of? I’m not a mind reader Jonathan you got to tell me, tell me. It’s not that hard, tell me Jonathan seriously, tell me. OK? I talked to you Jonathan my God you’re an intelligent guy, what’s the deal tell me, you’re afraid for Vickie what what are you afraid of Vickie for? What are you afraid of of for Vickie? Tell us so we can get over this hurdle this Vickie. Hurdle ... what’s the problem? Jon Jonathan tell me what’s the problem? Did you kill anyone there Jonathan? Look me in the eye yes or no, did you kill anyone there?
Doody: No.
Detective Sinsabaugh: I can’t hear you Jonathan, did you kill anyone there takes [sic] a stand.
Doody: No.
Detective Sinsabaugh: OK, why is it that [sic] so hard to say is it because you might of, I don’t think you killed anyone Jonathan, but I know you were there. Jonathan I’m gonna ask you this and don’t give me information any doubts *999 [sic] on it, cause I don’t think you killed anyone, did you kill anyone at the Temple?
Doody: No.
Detective Sinsabaugh: Why is that hard to answer? You were there though Jonathan, right? Right? Jonathan, were you at the Temple? Jonathan, were, I’m asking you flat out, were you involved? Jonathan were you involved, don’t lie to me yes or no? Tell me Jonathan, were you involved, I need to know so we can get over this and work on it. Were you involved? Tell me Jonathan. You were involved Jonathan, tell me. I know that but I need to know if you killed anybody, you said you didn’t kill well how do I know if you’re lying to me about this? Were you involved? Jonathan were you involved? Answer me, answer me Jonathan. Jonathan answer me. Answer me. What what’s the problem answer me Jonathan what what are we going through all this, we want to work things out, what’s the difference, we all [sic] ready know what’s up Jonathan you’re here, ya know we took you out of ROTC, this isn’t a game OK you need you [sic] to help us out on this. And why you doing this, this doesn’t look like a guy who wants to help us out, what’s the problem? Were you involved?
Interrogation Transcript, Tape 9, pp. 1-8. Doody finally responded, ‘Tes.” Id. at 8.
Over the course of several more hours of interrogation, Doody gave the detectives the “confession” they sought. Doody informed the detectives that Caratachea and Garcia approached him with a plan to conduct a war game with the goal of surrounding the temple without triggering the security system. Doody went to the temple with Caratachea, Garcia, and two others, George Gonzalez (Gonzalez) and his friend. Doody explained that he had no intention of entering the temple but, once past the security sensors, he followed the others inside. According to Doody, Caratachea, Garcia, Gonzalez, and the other participant ransacked the temple’s living quarters and gathered the victims into the main room. After one of the monks recognized Gonzalez, Doody was ordered to go outside and confirm that the walls were sound-proof. Doody maintained that the shootings occurred while he was outside and that he did not know who fired the shots. Doody, 930 P.2d at 444.
On the same night that Doody was interrogated, Garcia was also questioned. Garcia identified Doody as the mastermind of the plan to rob the temple. Garcia’s version of events was that once they were inside the temple, Doody was determined to leave no witnesses. According to Garcia, he attempted to persuade Doody not to shoot the victims but was unsuccessful. Instead, Doody shot each victim in the head with a rifle Doody borrowed from Caratachea. Garcia stated that he and Doody were the only participants in the murders.
Investigators subsequently searched Garcia’s home and discovered several items taken from the temple. They also recovered a shotgun that matched shells from the crime scene. The two confessions and the evidence collected at Garcia’s home resulted in dismissal of all charges against the Tucson Four from whom the police had previously obtained confessions. Doody and Garcia were subsequently charged with the murders. See id.
Prior to trial, Doody and Garcia filed motions to suppress their confessions. Id. At the suppression hearing, Detective Riley described Doody as “very polite, attentive, and just overall pleasant.” Suppression Hearing Transcript, October 27, 1992, pp. 68-69. Detective Riley described using “a standard issue juvenile Miranda form issued by the office” to inform Doody of his Miranda rights. Id. at 77-78. Ac *1000 cording to Detective Riley, he went through the form with Doody, who initialed the applicable areas of the form. Detective Riley stated that Doody was “very attentive. [Doody] made eye contact with [Detective Riley] as [he] spoke to [Doody] and, again, was polite and courteous.” Id. at 81. Detective Riley stated that Doody did not display any doubt while answering the questions. He estimated that it took fifteen to twenty minutes to administer the Miranda warnings.
When asked if Doody appeared tired during the interrogation, Detective Riley responded, “I’d have to say for the most part no. [Doody] didn’t really display any real overt sign of being fatigued or tired.” Id. at 89. Detective Riley testified that he used a “[q]uiet and calm” voice when he questioned Doody. Id. at 90.
Detective Riley confirmed that there were long periods during the interview when Doody remained silent while Detective Riley kept asking questions. During these periods, Doody’s “posture began to deteriorate. His attentiveness also deteriorated. And his eye contact dropped to where he would look at the ground for long periods of time. He would clinch his beret in his hand.” Suppression Hearing Transcript, October 28, 1992, p. 35. Detective Riley agreed that certain periods could be described as an “impasse.” Id. at 37. Detective Riley acknowledged that the transcripts reflected a four-page speech in which he was trying to get Doody to provide additional information. After this “four-page ... speech,” Doody responded, “I don’t know anymore.” Id. at 43.
Following the suppression hearing, the trial court denied both Garcia’s and Doody’s motions to suppress. Doody, 930 P.2d at 444. Garcia entered into a plea agreement, “pursuant to which the state agreed not to pursue the death penalty and Garcia agreed to testify against Doody.” Id. “In addition, Garcia pled guilty to nine counts of first degree murder and one count of burglary in connection with the temple murders, as well as one count of first degree murder in an unrelated homicide (the Cameron murder).” Id.
At Doody’s trial, Garcia testified consistent with his statements to the investigators. See id. Doody was not allowed to cross-examine Garcia regarding the Cameron homicide or other unrelated and uncharged offenses Garcia committed with Caratachea, “including a series of burglaries and conspiracy to commit murder and armed robbery (the Cruz offenses).” Id.
The jury ultimately convicted Doody on all counts. However, the verdict forms revealed that the jury premised Doody’s first degree murder convictions on felony murder rather than on premeditated murder. Id.
Doody appealed his convictions to the Arizona Court of Appeals. Id. at 445. Addressing Doody’s confession, the Court of Appeals observed that “the troublesome length of Doody’s questioning does not, in itself, establish that the officers overcame Doody’s will to resist confessing.” Id. at 446 (citation omitted). The Court of Appeals opined:
Other factors indicate that, despite the length of the interrogation, Doody confessed voluntarily. Although the entire interrogation lasted approximately thirteen hours, Doody admitted he had borrowed Caratachea’s rifle at the time of the temple murders after approximately two and one-half hours of questioning. Doody admitted he had participated in the temple robbery after approximately six and one-half hours of questioning, and his description of the events at the temple spanned nearly two hours. During the remaining hours, the detectives *1001 reviewed Doody’s testimony and probed for a connection to the Tucson Four.

Id.

Additionally, the Court of Appeals concluded that “[although Doody characterizes the tone of the interrogation as coercive, the audio tapes reveal a courteous, almost pleading style of questioning during most of the interview.” Id. The Court of Appeals noted that “[e]ach of the officers involved in the interrogation testified at the suppression hearing that Doody remained alert and responsive throughout the interrogation and did not appear overtired or distraught. Our review of the audio tapes confirms the officers’ testimony.” Id. The Court of Appeals found that there was “no evidence that calls into question the testimony that Doody remained alert and responsive.” Id.
The Court of Appeals rejected Doody’s argument that the police officers pressured him into a confession:
The officers used a variety of approaches in questioning Doody. They emphasized Doody’s experience in the high school honor guard and color guard and appealed to his sense of honor as a soldier. At impasses in the interview, the police captain entered the interrogation room and likened himself to a commanding officer in the military, encouraging Doody to trust and confide in him. The officers feigned empathy with Doody’s situation and pleaded with Doody to prove his innocence. The officers also indicated to Doody that other suspects had implicated him in the temple murders and that Doody’s best defense would be to explain his version of the events.
Id. at 447. The Court of Appeals held that “[t]he tactics, though deceptive in part, were not so egregious as to overcome Doody’s will and ... the record contradicts Doody’s claim on appeal that the method of interrogation induced him to confess.” Id. at 447-48.
The Arizona Court of Appeals also determined that the police officers properly provided Doody with the requisite “clear and understandable” Miranda, warnings. Id. at 449. Specifically, the Court of Appeals concluded that “[t]he officers read each warning from a standard juvenile form and provided additional explanations as appropriate.” Id.
Doody challenged the Arizona Court of Appeals decision in a federal habeas petition, which was denied. However, the district court granted a certificate of appealability concerning the voluntariness of Doody’s confession and the adequacy of the Miranda warnings given Doody.
In Doody v. Schriro, 548 F.3d 847 (9th Cir.2008), a panel of this court reversed the district court’s denial of Doody’s habeas petition. Appellee Dora Schriro filed a petition for rehearing en bane, which we granted. Doody v. Schriro, 566 F.3d 839 (9th Cir.2009).

II. STANDARDS OF REVIEW

“We review the federal district court’s decision to deny [Doody’s] habeas petition de novo.” DeWeaver v. Runnels, 556 F.3d 995, 997 (9th Cir.2009) (citation omitted).
[B]ecause [Doody] filed his habeas petition after the effective date of the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA), we must deny the petition unless the state court’s adjudication of [Doody’s] claims resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
*1002 Mendez v. Knowles, 556 F.3d 757, 767 (9th Cir.2009) (citation omitted).
Under AEDPA, “[t]he state court unreasonably applies clearly established federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable.” DeWeaver, 556 F.3d at 997 (citations and internal quotation marks omitted). “Under applicable federal habeas law, state court findings of fact are presumed correct unless rebutted by clear and convincing evidence or unless based on an unreasonable evidentiary foundation.” Gonzalez v. Pliller, 341 F.3d 897, 903 (9th Cir.2003) (citations omitted). We review the decision of the Arizona Court of Appeals as the last reasoned state court decision on the matter. Holley v. Yarborough, 568 F.3d 1091, 1098 (9th Cir.2009). We apply the unreasonable application prong of AEDPA because the Arizona Court of Appeals identified the applicable governing rule for each issue.

III. DISCUSSION

A. Adequacy of the Miranda Warnings
“[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.” Miranda, 384 U.S. at 444, 86 S.Ct. 1602. “[T]o reduce the risk of a coerced confession and to implement the Self-Incrimination Clause, [the Supreme Court] in Miranda concluded that the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored[.]” Missouri v. Seibert, 542 U.S. 600, 608, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (citations and internal quotation marks omitted). “Miranda conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained.” Id. (footnote reference omitted). “Miranda addressed interrogation practices likely to disable an individual from making a free and rational choice about speaking, and held that a suspect must be adequately and effectively advised of the choice the Constitution guarantees[.]” Id. at 611, 124 S.Ct. 2601 (citations, alterations, and internal quotation marks omitted). “The [relevant) inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by Miranda.” Duckworth v. Eagan, 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (citation, alterations, and internal quotation marks omitted).
In its analysis of the adequacy of the Miranda warnings, the Arizona Court of Appeals concluded that “the officers advised Doody of his Miranda rights in a clear and understandable manner and that Doody made a knowing and intelligent waiver.” Doody, 930 P.2d at 449.
However, the record actually reflects that the detective’s administering of the Miranda warnings was far from “clear and understandable.” The Arizona Court of Appeals completely failed to consider the detective’s significant deviations from the printed Miranda form and his repeated minimizing of the warnings’ significance.
During his administration of the warnings, Detective Riley emphasized that Doody should not “take them out of context,” and implied to a juvenile, who had never heard of Miranda, that the warnings were just formalities. This misdirection was coupled with repeated assurances that the detectives did not necessarily sus *1003 pect Doody of any wrongdoing. Most significantly, in informing Doody of the right to counsel, Detective Riley deviated from the form containing the juvenile Miranda warnings, and ad libbed that Doody had the right to counsel if Doody was involved in a crime. Indeed, Detective Riley instructed Doody that he had the right to counsel “if you were involved in it ... but if you were, then that’s what that would apply to[.]” The implication from this improperly qualified, unclear, and confusing warning was that Doody only had the right to counsel if he were involved in a crime. In such a circumstance, the invocation of one’s right to counsel would be tantamount to admitting one’s involvement in a crime. Overall, the fact that Detective Riley’s explanation of a one-page Miranda warning form consumed twelve transcribed pages of text is a testament to the confusion generated by the detective’s obfuscation. When evaluated against clearly established Supreme Court precedent, the Miranda warnings yrere constitutionally deficient. At a minimum, Doody was never clearly and reasonably informed that he had the right to counsel. See Miranda, 384 U.S. at 471-72, 86 S.Ct. 1602 (“[A]n individual held for interrogation must be dearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege ... As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. ...”) (emphasis added).
The Miranda warnings provided to Doody were defective because Detective Riley downplayed the warnings’ significance, deviated from an accurate reading of the Miranda waiver form, and expressly misinformed Doody regarding his right to counsel. In view of clear, convincing and contrary evidence, the Arizona Court of Appeals’ conclusion that the Miranda warnings were “clear and understandable” constituted both an unreasonable determination of the facts and an unreasonable application of clearly established federal law. Seibert, 542 U.S. at 608, 124 S.Ct. 2601.
Our colleagues in dissent chastise us for reaching these conclusions, accusing the majority of “once more pay[ing] mere lip service to AEDPA and then proceeding] as though it does not exist.” Dissenting Opinion, p. 1034. The dissent would prefer that we simply parrot the findings made during the state court proceedings and call it a day. However, if we succumb to the temptation to abdicate our responsibility on habeas review, we might as well get ourselves a big, fat rubber stamp, pucker up, and kiss The Great Writ goodbye.
The dissent strains mightily to salvage the Miranda warnings given in this case. Yet the inquiry is a simple one: “whether the warnings reasonably conveyed to a suspect his rights as required by Miranda.” Duckworth, 492 U.S. at 203, 109 S.Ct. 2875 (citation, alterations and internal quotation marks omitted). The Arizona Court of Appeals went even further, holding that the warnings “were conveyed in a clear and understandable manner.” Doody, 930 P.2d at 449. The dissent implicitly acknowledges the error in the Arizona Court of Appeals’ holding when it concedes that the warnings given were susceptible to multiple interpretations. See Dissenting Opinion, pp. 1038-39. It defies reason to conclude that a matter is both clear and ambiguous. Indeed, at oral argument, even counsel for the State of Arizona was hard pressed to explain what the officer’s explanation meant.[3]
*1004 Our colleagues in dissent cite Duckworth and California v. Prysock, 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981) in support of their argument that the Arizona Court of Appeals reasonably applied Miranda. See Dissenting Opinion, pp. 1035— 37. Yet, as the dissent admits, “Duck-worth addressed different facts from the ones before us ...” Id. at 1039. Duck-worth did not involve a juvenile defendant. The officers did not deviate from the printed form with inaccurate and garbled elaborations. There was no downplaying of the significance of the warnings. Most importantly, there was no implication that the right to counsel was available only if the individual being questioned had committed a crime. See Duckworth, 492 U.S. at 198-99, 109 S.Ct. 2875.
Although the dissent is not as candid in its discussion of Prysock, that case is similarly inapposite. In Prysock, unlike in this ease, the juvenile’s parents were present. See Prysock, 453 U.S. at 356, 101 S.Ct. 2806. As in Duckworth, the officer did not deviate from the written Miranda warnings with inaccurate and garbled elaborations. As in Duckworth, there was no downplaying of the significance of the Miranda warnings. As in Duckworth, there was no implication that the right to counsel was available only if the individual being questioned had committed a crime. See Prysock, 453 U.S. at 356-57, 101 S.Ct. 2806. In sum, the best cases that can be mustered in support of the dissent’s argument are readily distinguishable.[4]
The fact remains that the transcript reveals the use of Miranda warnings that were the very antithesis of clear. Compounding the lack of clarity was Doody’s express statement to the detective that he had never heard of Miranda warnings. Rather than ensuring that Doody understood the warnings, the detective plowed ahead, as reflected in the following excerpt from the interrogation transcript:
Riley: Any questions?
Doody: No.
Riley: Okay. Okie dokie.
Doody: Oh yeah what’s this for? (apparently referring to the Miranda form) Riley: Ah, okay I’ll, again, I’m gonna go in and, and explain some things to you. Ah, in the next one states that if you cannot afford an attorney, you’d have the right to have one appointed for you
Doody Interrogation Transcript, Tape 1, p.
10.
Despite Doody’s expressed lack of knowledge concerning the Miranda warnings and Doody’s subsequently conveyed confusion in the question “what’s this for?”, Detective Riley ignored Doody’s query, and moved on to the next item on his printed list.
Detective Riley injected additional confusion into the process by informing Doody *1005 that the Miranda warnings were for the mutual benefit of Doody and the officers. Not once, not twice, but three times Detective Riley represented to Doody that the warnings were mutually beneficial. See Doody Interrogation Transcript, Tape 1, p. 2. “It’s only something for, for your benefit and for our benefit, okay,” see also id. at p. 3 “[A]ll it is, is its [sic] something that’s ah for your benefit, as well as four our’s [sic], okay,” id. at p. 4 “it’s for your benefit, it’s for your protection and for our’s [sic] as well okay?” This repeated misstatement of the purpose of Miranda warnings carries a drastically different connotation than if the detective had given Doody a straight-forward explanation that the warnings were given for Doody’s protection, to preserve valuable constitutional rights.
The dissent’s proposition that the warnings could be construed as reinforcing that Doody was “faced with a phase of the adversary system,” Dissenting Opinion, p. 1040, is more wishful thinking than fact. The detective’s very words belie such a construction. Neither was the detective’s foray a minor “deviation” from the printed warnings. Rather, the detective’s garbled, rambling, inaccurate, obfuseatory advisement consumed twelve pages of transcript. Although no magic words are required, Miranda warnings must “clearly inform[ ]” the individual of his rights. Miranda, 384 U.S. at 471, 86 S.Ct. 1602. The dissent’s best efforts notwithstanding, the transcript speaks for itself, revealing a patent lack of clarity. The Arizona Court of Appeals’ ruling to the contrary unreasonably applied Miranda’s requirement that the warnings “clearly inform[ ].” Miranda, 384 U.S. at 471, 86 S.Ct. 1602.
We agree with our concurring colleague that the Supreme Court’s decision in Powell does not alter the analysis or outcome of this case. See Concurring Opinion, pp. 1025-27. Indeed, our dissenting colleagues also acknowledge that Powell does not change the way this case should be analyzed. See Dissenting Opinion, p. 1037.
In Powell, the Miranda warning form consisted of the following text:
You have the right to remain silent. If you give up the right to remain silent, anything you say can be used against you in court. You have the right to talk to a lawyer before answering any of our questions. If you cannot afford to hire a lawyer, one will be appointed for you without cost and before any questioning. You have the right to use any of these rights at any time you want during this interview.
130 S.Ct. at 1200 (citations omitted).
The warning in Powell was read verbatim, with no elaboration. The latter fact appears to have been important to the Supreme Court’s determination that the warning was consistent with the Miranda requirements. In discussing its ruling in Prysock, the Supreme Court explained that it upheld the Miranda warnings in that case because “nothing in the warnings ... suggested any limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general ...” Id. at 1204 (citation omitted).
Quite the opposite is true about the Miranda warnings given to Doody. In the midst of giving Doody his warnings, Detective Riley expressly and affirmatively limited those warnings by informing Doody that he was only entitled to counsel if he was involved in a crime. In addition, as discussed above, Detective Riley repeatedly minimized the importance of the Miranda warnings, deviated from an accurate reading of the printed form and obfuscated the meaning of the warnings. Because the facts of this case differ so markedly from those in' Powell, we continue in our view that the Miranda warnings provided to *1006 Doody did not clearly convey his rights to an attorney, and that the Arizona Court of Appeals unreasonably applied Miranda in ruling to the contrary.
Our colleagues in dissent recite the well-established requirement that “an accused must be ‘clearly informed’ of his rights” prior to interrogation. Dissenting Opinion, p. 1034 (quoting Miranda, 384 U.S. at 471, 86 S.Ct. 1602). Yet, in the immediately following pages, the dissent strains to justify the Miranda warnings given to Doody that came nowhere close to meeting the Miranda standard mandating clarity.
Simply stating that something is so does not make it so. Indeed, no amount of repetition can change the fact that the downplayed, obfuscated, garbled warnings given to Doody ran afoul of the clarity mandated by Miranda. Detective Riley’s twelve-page “explanation” of a simple one-page form was the very antithesis of clarity. The officers in Powell administered the standard Miranda warnings from a form with no elaboration. See Powell, 130 S.Ct. at 1200. The form merely failed to explicitly inform the suspect that the right to counsel ■ existed during questioning as well as before questioning. See id. at 1205. In contrast, Detective Riley went beyond administering the standard form, consuming twelve transcribed pages in minimizing the importance of the Miranda warnings and affirmatively advising Doody that he had a right to counsel if he was involved in a crime.
Our dissenting colleagues seek Supreme Court authority that would have guided the Arizona Court of Appeals to the conclusion that Detective Riley’s Miranda delivery impermissibly downplayed the significance of the warnings. See Dissenting Opinion, pp. 1002-03. To be sure, the Arizona Court of Appeals need only have referred to Miranda itself. In Miranda, the Supreme Court clearly established the basic protection that “an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation ...” Miranda, 384 U.S. at 471, 86 S.Ct. 1602 (emphasis added). The Supreme Court articulated the reasoning underlying the need for such warnings:
We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual’s will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.
Id. at 467, 86 S.Ct. 1602 (emphases added). Given the Supreme Court’s articulation of the vital nature of Miranda warnings, it is inconceivable that Miranda stands for the dissent’s proffered proposition that a police officer may misstate the right to counsel and denigrate the importance of the very protections for which Miranda provides. Logic dictates otherwise. See id. at 476, 86 S.Ct. 1602 (“The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation.”).
Our colleagues in dissent accuse us of ignoring the “binding constitutional concept” of “comity.” Dissenting Opinion, p. 1038. However, comity does not command abdication. Rather, as Article III judges, we have a responsibility to grant habeas relief if Supreme Court precedent has been unreasonably applied. See Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (“Even in the *1007 context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a state court’s ... determination and, when guided by AEDPA, conclude the decision was unreasonable ... ”) (emphasis added).
The dissent quotes liberally from the Supreme Court’s recent decision in Harrington v. Richter, — U.S.-, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) to emphasize the high standard governing habeas review. See, e.g., Dissenting Opinion at p. 1038. The majority does not quarrel with that standard. Indeed, this court has frequently applied that standard to deny habeas relief. See, e.g., McNeal v. Adams, 623 F.3d 1283, 1287-88 (9th Cir.2010); Norris v. Morgan, 622 F.3d 1276, 1287-88 (9th Cir.2010); McCormick v. Adams, 621 F.3d 970, 977 (9th Cir.2010); Cheney v. Washington, 614 F.3d 987, 996-98 (9th Cir.2010); Murdoch v. Castro, 609 F.3d 983, 995-96 (9th Cir.2010) (en banc); Ponce v. Felker, 606 F.3d 596, 606 (9th Cir.2010).
However, when police officers interrogating a juvenile transform Miranda’s warnings into a twelve-page rambling commentary that is in alternating part misleading and unintelligible, we believe that “there is no possibility fairminded jurists could disagree,” Richter, 131 S.Ct. at 786, that the suspect was not informed of his rights in clear terms, as Miranda’s holding requires. See Miranda, 384 U.S. at 467-68, 86 S.Ct. 1602 (“[I]f a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent.”) (emphasis added); see also id. at 471, 86 S.Ct. 1602 (“[W]e hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation.”) (emphasis added). Thus, whatever the applicable standard for reviewing the state court decision, the violation of Doody’s rights in this case is so absolutely clear as to compel that the Writ be granted.[5],[6]
B. Voluntariness of Doody’s Confession[7]
As Justice Frankfurter recognized over sixty years ago:
*1008 A statement to be voluntary of course need not be volunteered. But if it is the product of sustained pressure by the police it does not issue from a free choice. When a suspect speaks because he is over-borne, it is immaterial whether he has been subjected to a physical or a mental ordeal. Eventual yielding to questioning under such circumstances is plainly the product of the suction process of interrogation and therefore the reverse of voluntary. We would have to shut our minds to the plain significance of what here transpired to deny that this was a calculated endeavor to secure a confession through the pressure of unrelenting interrogation. The very relentlessness of such interrogation implies that it is better for the prisoner to answer than to persist in the refusal of disclosure which is his constitutional right ...
Watts v. Indiana, 338 U.S. 49, 53-54, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949).
 In determining the voluntariness of a confession, a court “examines whether a defendant’s will was overborne by the circumstances surrounding the giving of a confession.” Dickerson v. United States, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (citation and internal quotation marks omitted). “The due process test takes into consideration the totality of all the surrounding circumstances— both the characteristics of the accused and the details of the interrogation.” Id. (citations and internal quotation marks omitted). It is not sufficient for a court to consider the circumstances in isolation. Instead, “all the circumstances attendant upon the confession must be taken into account.” Reck v. Pate, 367 U.S. 433, 440, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961) (citations omitted).
The Supreme Court has observed that, “[t]he application of these principles involves close scrutiny of the facts of individual cases.” Gallegos v. Colorado, 370 U.S. 49, 52, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) (emphasis added). “The length of the questioning, the use of fear to break a suspect, [and] the youth of the accused are illustrative of the circumstances on which cases of this kind turn.” Id. (citations omitted). An additional relevant factor is “the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation.” Withrow, 507 U.S. at 693-94, 113 S.Ct. 1745(citations omitted). Thus, we ask: “Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.” Schneckloth v. Bustamonte, 412 U.S. 218, 225-26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (citation omitted).
The fact that Doody was a juvenile is of critical importance in determining the voluntariness of his confession. The Supreme Court “has emphasized that admissions and confessions of juveniles require special caution.” In re Gault, 387 U.S. 1, 45, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). In Haley v. Ohio, 332 U.S. 596, 599-600, 68 S.Ct. 302, 92 L.Ed. 224 (1948), the Supreme Court observed:
What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child — an easy victim of the law — is before us, special care in scrutinizing the record must be used. Age 15 is a ten *1009 der and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. A 15-year-old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition. Mature men possibly might stand the ordeal from midnight to 5 a.m. But we cannot believe that a lad of tender years is a match for the police in such a contest.
Although Haley involved a fifteen-year old juvenile, the principles underlying the Supreme Court’s observation apply equally to Doody’s circumstances given the intensity of his interrogation and his isolation during twelve-plus sleep-deprived hours of continuous questioning. See Gilbert v. Merchant, 488 F.3d 780, 791 (7th Cir.2007) (“[A]s the Supreme Court explained in Gallegos v. Colorado, a teenager may not on his own be able to fully appreciate what is at stake when the police seek to question him[J”).
The audiotapes of Doody’s interrogation are dispositive in this case, as we are not consigned to an evaluation of a cold record, or limited to reliance on the detectives’ testimony. We can readily discern from the audiotapes an extraordinarily lengthy interrogation of a sleep-deprived and unresponsive juvenile under relentless questioning for nearly thirteen hours by a tag team of detectives, without the presence of an attorney, and without the protections of proper Miranda warnings. The intensive and lengthy questioning was compounded by Doody’s lack of prior involvement in the. criminal justice system, his lack of familiarity with the concept of Miranda warnings, and the staging of his questioning in a straight-back chair, without even a table to lean on. None of these considerations were even mentioned by the Arizona Court of Appeals.
The dissent denigrates the majority for, in its view, “attempting] to paint Doody as a tender youth, lacking intellect or sophistication, younger than his chronological age of seventeen-and one-half years.” Dissenting Opinion, p. 1041. However, it is not the majority that has set the standard for considering the juvenile status of a subject. The Supreme Court has consistently reminded us that “admissions and confessions of juveniles require special caution.” In re Gault, 387 U.S. at 45, 87 S.Ct. 1428; see also Haley, 332 U.S. at 599-600, 68 S.Ct. 302; Gallegos, 370 U.S. at 53, 82 S.Ct. 1209(noting that a teenager may not be fully appreciative of the high stakes involved when “questioned through the dead of night by relays of police”). More importantly, the facts, as supported by the record in this case, reveal that Doody was indeed an unsophisticated teenager.
As recently as 2005, the Supreme Court reminded us of the special concern with which we should approach issues involving “juveniles under 18.” The Supreme Court declared that “as any parent knows and as the scientific and sociological studies ... tend to confirm, a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.” Roper v. Simmons, 543 U.S. 551, 569, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (citations, alteration, and internal quotation marks omitted). “In recognition of the comparative immaturity and irresponsibility of juveniles, almost every State prohibits those under 18 years of age from voting, serving on juries, or marrying without parental consent.” Id. (citation omitted).
*1010 Apparently, the State of Arizona holds a similar view of the inability of juveniles to fully appreciate the magnitude of various and sundry life experiences. See Porter v. Triad of Ariz., 203 Ariz. 230, 52 P.3d 799, 802 (Ariz.Ct.App.2002) (“[I]n Arizona, a minor is never allowed to bring an action in his own name but must always sue through a representative whatever the cause of action.”) (citation omitted); First Nat’l Bank of Ariz. v. Taylor, 5 Ariz.App. 327, 426 P.2d 663, 666 (1967) (“[Mjinor beneficiaries cannot consent to the termination of a trust for their benefit.”) (citations omitted); A.R.S. § 4-101(18) (establishing the “legal drinking age” as “twenty-one years of age or older”); A.R.S. § 28-3320(A)(5) (providing for suspension of driver’s license of individual “under eighteen years of age” for possessing or purchasing materials “used for graffiti”); A.R.S. § 5-504(B)(5) (prohibiting individuals under eighteen years of age from selling lottery tickets); A.R.S. § 5-515.02 (prohibiting individuals under twenty-one years of age from purchasing lottery tickets); A.R.S. § 5-601.02(w)(l)(prohibiting persons under twenty-one years of age from gambling); A.R.S. § 8-101(4) (defining “child” as “any person under eighteen years of age”); A.R.S. § 9-500.26 (regulating entry from Arizona into Mexico “by any resident ... who is under eighteen years of age”); A.R.S. § 13-3111 (prohibiting minors under eighteen years of age from possessing firearms); A.R.S. § 13-3403(A)(2) (prohibiting sale or transfer of “a vapor-release substance containing a toxic substance to a person under eighteen years of age.”); A.R.S. § 13-3403.01(A) (prohibiting the sale or delivery of a container containing nitrous oxide “to a person under eighteen years of age”); A.R.S. § 13-3513 (prohibiting sale or distribution in vending machines of materials harmful to individuals under the age of eighteen); A.R.S. § 13-3721(A)(1) (prohibiting tattooing or body piercing “of a person who is under eighteen years of age without the physical presence of the parent or legal guardian ... ”); A.R.S. § 15-805(B)(1) (requiring presence of parent or person having custody when a citation for not attending school “is issued to a child under eighteen years of age”); A.R.S. § 17-362(A) (prohibiting any person “under eighteen years of age” from serving as a licensed guide); A.R.S. § 23-231 (prohibiting persons under the age of eighteen from being employed in certain occupations unless a variance is obtained); A.R.S. § 25-102(A) (providing that “[pjersons under eighteen years of age shall not marry without the consent of the parent or guardian having custody of such person”); A.R.S. § 28-1555(A) (“A court shall not dispose of a moving traffic violation charge arising from the issuance of a traffic citation to a juvenile under eighteen years of age unless a parent or guardian of the juvenile appears in court with the juvenile at the time of the disposition of the charge.”); A.R.S. § 32-558 (requiring private schools to enter into a contract with students, and providing that “[a] contract between a school and a student shall bear the signature of a school official and the student or parent or guardian if the student is under eighteen years of age”); A.R.S. 36-798.01 (limiting access of persons under eighteen to tobacco products); A.R.S. § 44-1602(H) (“A dealer shall not purchase any precious item from any person under eighteen years of age unless the person is accompanied by a parent or guardian who must submit identification ...”); A.R.S. § 11-251(40) (permitting board of supervisors to impose curfew on minors); A.R.S. ■ § 28-3151, Op. Atty. Gen. No. 67-25-L (providing that a chauffeur’s license cannot be issued to a person under eighteen years of age); A.R.S. § 36-333.03(A) (requiring parent or legal guardian of a person under eighteen years of age to peti *1011 tion court to establish minor’s date of birth, place of birth, and parentage); A.R.S. § 36-673(D) (“A minor child [under eighteen years of age] shall not be immunized without the informed consent of the parent, guardian or person in loco parentis of the child ...”).
In sum, under the law, and as a matter of fact and common knowledge, Doody’s participation in ROTC, his not-yet-completed high school studies, his work as a grocery store bagger, his ability to speak English as a second language and his lack of mental disability in no way lessen the Supreme Court’s instruction regarding the special caution with which we review a confession extracted from a teenager.
The dissent makes the same mistake the Arizona Court of Appeals made — ticking off the list of circumstances rather than actually considering them in their totality. Lest the dissent remain “confounded” by this unremarkable conclusion, Dissenting Opinion, pp. 1048-49, we liken the Court of Appeals’ superficial approach to the listing of a number of mental conditions without explaining how and the extent to which those conditions affect an individual’s ability to reason. See, e.g., Earp v. Ornoski, 431 F.3d 1158, 1178 (9th Cir.2005), as amended (noting the expert’s conclusion of the nature of the mental impairment and how that impairment affected the individual). The Court of Appeals’ approach is also similar to the state court analysis we criticized in Barker v. Fleming, 423 F.3d 1085 (9th Cir.2005), where we noted the “crucial” requirement from the Supreme Court of a cumulative assessment when determining the materiality of Brady evidence. Id. at 1094. We observed that “the Washington Supreme Court did not conduct [a cumulative] analysis. Instead, the court separately analyzed the ... evidence ... on a piece-meal basis and then ended its analysis.” Id. Likewise, the Arizona Court of Appeals listed the circumstances of Doody’s interrogation separately “on a piece-meal basis and then ended its analysis.” Id.
Most disturbing is the dissent’s reliance on the Arizona Court of Appeals’ justification that “[t]he detectives allowed Doody to take bathroom breaks and offered him food and drinks throughout the interrogation.” Dissenting Opinion, p. 1042. Never mind that the first break was over nine hours into the interrogation, after Doody’s will was overborne. That fact was not discussed at all by the Arizona Court of Appeals. The court also completely ignored the fact that Doody was not a native of this country, other than to note that his English was “lightly accented.” See Doody, 930 P.2d at 445. The court never even mentioned the number of officers involved in the interrogation, the tag team approach used, or the false confessions that the same police task force had extracted previously from the Tucson suspects.[8] Doody’s statements were simply not voluntary given the totality of the circumstances. For the most part, Doody was virtually non-responsive despite being peppered with a barrage of questions, exhortations, and commands. This pattern recurred throughout the interrogation.
The Arizona Court of Appeals’ ruling was also premised on an unreason *1012 able determination of several pivotal facts. For example, the Arizona Court of Appeals held that “[e]ach of the officers involved in the interrogation testified at the suppression hearing that Doody remained alert and responsive throughout the interrogation and did not appear overtired or distraught. Our review of the audio tapes confirms the officers’ testimony.” Id. at 446. The court of appeals also determined that “[t]he record, both at the time of the suppression hearing and after trial, includes no evidence that calls into question the testimony that Doody remained alert and responsive.” Id. (emphasis added). However, review of the audiotapes reveals a completely different scenario. During the relentless questioning by the detectives, Doody was anything but “responsive.” In fact, the detectives utilized relentless interrogation tactics precisely because Doody remained unresponsive and did not provide the answers they sought. At approximately 3:00 a.m., the three officers bombarded Doody with questions in the face of almost complete silence from Doody. They asked him five times who devised the plan to go to the temple. Doody did not answer. They inquired fourteen times whether Caratachea came up with the idea. Doody responded only once — that he did not know. They asked twenty-five times whether Doody was present at the temple. Doody was silent. During this sequence, lasting approximately twenty minutes, Doody answered one out of forty-five questions. That is a far cry from responsive. Indeed, at one point Doody was admonished to “stop freezing up.”
The next series of questions addressed whether Doody’s failure to respond was due to threats from someone. As an initial matter, we note that this line of questioning completely undermines the detectives’ testimony and the Court of Appeals’ conclusion that Doody was responsive. If Doody were indeed responsive, there would be no need to question him regarding why he was not responding. Doody responded to a few of these questions, but again fell silent when the detectives inquired seven times about whose idea it was to go to the temple. Doody remained silent for eight minutes in the face of thirty questions in a row. Doody only broke his silence when Detective Sinsabaugh asked him nine times whether he remembered the detective’s name. Doody’s answers to these questions from Detective Sinsabaugh were barely audible.
The suppression hearing testimony confirms that Doody was not “alert and responsive.” Although Detective Riley testified that Doody was alert, this was not the full extent of his suppression hearing testimony. Detective Riley confirmed that there were extended periods during the interrogation when Doody remained unresponsive, when Doody’s posture “deteriorated,” and when Doody looked down at the ground for long periods of time. Detective Riley also acknowledged that there were several pages of transcript reflecting that Doody did not respond to his continuous questioning.
In view of the fact that we are considering the questioning of a sleep-deprived juvenile subjected to, nearly thirteen hours of uninterrupted interrogation, the degree of Doody’s responsiveness is a pivotal concern. The audiotapes reveal that the Arizona Court of Appeals’ factual determination that there was no evidence indicating Doody’s non-responsiveness was “rebutted by clear and convincing evidence.” Gonzalez, 341 F.3d at 903 (citations omitted); see also Wiggins v. Smith, 539 U.S. 510, 528, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (“This partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court’s decision.”). Indeed, the Arizona Court of Appeals acknowledged that “Doody did not speak for *1013 long periods during the interrogation.” Doody, 930 P.2d at 447. This acknowledgment directly contravenes the conclusion that Doody was responsive.
The dissent concedes, as it must, that “Doody did not speak for long periods during the interrogation.” Dissenting Opinion, p. 1047 (quoting Doody, 930 P.2d at 447) (emphasis added). Yet, in a heroic effort to rehabilitate the unreasonable factual finding that Doody was nevertheless alert and responsive, the dissent relies on “visual clues” to contradict the tale of the silent audiotapes. Id. The dissent’s leap in logic completely fails to account for the officers’ continuous badgering of Doody for his failure to respond. If he were in fact responding, why would the detectives repeatedly question him regarding his lack of response and urge him to reply? More importantly, the dissent completely ignores Detective Riley’s testimony describing the “visual clues” of how Doody’s “posture began to deteriorate. His attentiveness also deteriorated. And his eye contact dropped to where he would look at the ground for long periods of time ...” Even assuming that there was equivocal evidence of responsiveness, the Arizona Court of Appeals’ finding that no evidence supported Doody’s claim was unreasonable.
The Arizona Court of Appeals also concluded that “the audio tapes reveal a courteous, almost pleading style of questioning during most of the interview.” Doody, 930 P.2d at 446. To the contrary, the audiotapes demonstrate that the detectives’ relentless and uninterrupted interrogation of an unresponsive juvenile was far from “courteous.” Instead, the detectives continuously demanded, over and over without a response from Doody, answers to their questions. The detectives’ unyielding demands for answers clearly rebut the Arizona Court of Appeals’ determination regarding the interrogation’s tone and convince us that Doody’s confession was not “the product of an essentially free and unconstrained choice.” See Schneckloth, 412 U.S. at 225-26, 93 S.Ct. 2041. Although the detectives sometimes couched their questions in “pleading” language, their tones were far from pleasant, varying from “pleading” to scolding to sarcastic to demeaning to demanding. Regardless of tone, over twelve hours of insistent questioning of a juvenile by tag teams of two, three and four detectives became menacing and coercive rather than “courteous.” Tellingly, some of the detectives’ statements, particularly those immediately preceding the confession, informed Doody that he had to answer their questions. Any doubt regarding the unreasonableness of the state court’s factual determination is easily resolved by listening to the audiotapes. Indeed, at times the tones of the detectives are downright chilling.
Let us not forget that this same task force questioned four adult men and, undoubtedly using the same tactics, procured what the State concedes were false confessions from all four. That the will of four adult men was overborne to the extent that they confessed to murders they did not commit further persuades us that the will of this young teen was similarly overborne. And that is the real elephant in the room, an elephant that both the Arizona Court of Appeals and the dissent studiously ignore — the undisputed evidence in the record that this same task force, undoubtedly using the same “courteous, almost pleading style of questioning” extracted false confessions from four adults for the same crime with which Doody was charged. Is there any doubt that the wills of those individuals were overborne?[9]
*1014 The existence of the false confessions, careful analysis of the interrogation tapes and due consideration of the totality of the circumstances foreclose an intellectually honest conclusion that the finding of voluntariness was reasonable.
The portions of the interrogation tapes quoted above may appear lengthy. However, they are literally just snippets of the entire interrogation, which consumed seventeen tapes.[10] These quotes are excerpts from only two of the tapes, and they are included as a sketch of the actual interrogation. They reveal a picture that bears no resemblance to the avuncular scene painted by the Arizona Court of Appeals. The Arizona Court of Appeals unreasonably minimized the length of Doody’s interrogation, an important factor in the voluntariness analysis. See Gallegos, 370 U.S. at 52, 82 S.Ct. 1209. The Arizona Court of Appeals determined that Doody confessed voluntarily because, “[a]l-though the entire interrogation lasted approximately thirteen hours, Doody admitted he had borrowed Caratachea’s rifle at the time of the temple murders after approximately two and one-half hours of questioning.” Doody, 930 P.2d at 446. Not so. While admitting that he and Garcia borrowed the rifle, Doody identified the time frame as “close to the end of June,” more than a month before the murders. Doody Interrogation Transcript, Tape # 3, p. 30. Therefore, contrary to the finding of the Arizona Court of Appeals, Doody decidedly did not admit to involvement in the temple murders after two and one-half hours of questioning. Indeed, as reflected in the audiotapes, Doody’s admission to any involvement occurred only after six-plus hours of intense interrogation by the detectives. The conclusion that Doody’s admission occurred after two and one-half hours of questioning finds no support in the record.
Our colleagues in dissent reason that, “although the interview lasted nearly thirteen hours, Doody made an inculpatory statement after about two and one-half hours by admitting to borrowing the murder weapon ...” Dissenting Opinion, pp. 1042. The dissent later clarifies that the Arizona Court of Appeals’ finding that “Doody admitted he had borrowed Caratachea’s rifle at the time of the temple murders ” was a reasonable factual finding. Dissenting Opinion, p. 1048 (citing Doody, 930 P.2d at 446) (emphasis added). In fact, Doody admitted to borrowing the rifle more than thirty days before the murder. A finding that Doody admitted possessing the murder weapon at the time of the crime is patently unreasonable when the admission actually addressed a time period substantially in advance of the date of the crime. The dissent resorts to name-calling, accusing the majority of being “disingenuous” and “re-writ[ing] the state court’s findings in order to declare them patently unreasonable.” Dissenting Opinion, p. 1048 (internal quotation marks omitted). However, there is no need to rewrite the state court’s finding on this point. No amount of sugarcoating can obscure the fact that the state court unreasonably found that Doody admitted possessing the murder weapon at the time of the murders when he made no such admission.
There is also no record support for the Court of Appeals’ trivializing of the hours of interrogation after Doody’s admission that he was involved in the events at the temple. The audiotapes reveal that the detectives continued to use the same interrogation techniques after Doody’s *1015 one-word admission. The detectives continued to pressure Doody for details concerning the events at the temple. By the end of the interrogation, Doody was sobbing almost hysterically.[11]
The prosecution used the details of his confession against Doody during trial to corroborate the testimonies of the prosecution’s key witnesses. The hours of interrogation subsequent to Doody’s confession to being present at the temple, therefore, were of critical importance to the case against Doody. The Arizona Court of Appeals’ contrary determination was objectively unreasonable. See Taylor v. Maddox, 366 F.3d 992, 1008 (9th Cir.2004) (“[Fjailure to take into account and reconcile key parts of the record casts doubt on the process by which the finding was reached, and hence on the correctness of the finding.”) (citation omitted).
Finally, the Arizona Court of Appeals’ voluntariness ruling unreasonably applied clearly established federal law because it analyzed the individual circumstances of the interrogation without weighing the totality of the circumstances. As discussed above, the Arizona Court of Appeals failed to consider “whether [Doody’s] will was overborne by the circumstances surrounding the giving of a confession.” Dickerson, 530 U.S. at 434, 120 S.Ct. 2326(citation and internal quotation marks omitted). “The determination depends upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.” Id. (citation, alteration, and internal quotation marks omitted) (emphasis added).
Rather than weighing all the circumstances, the Arizona Court of Appeals dismissed each relevant fact seriatim without considering whether Doody’s juvenile will was overborne by the relentless questioning of a tag team of detectives over the course of an interrogation that lasted, virtually without interruption and despite Doody’s non-responsiveness, from approximately 9:30 p.m. until 10:00 a.m. As noted above, the Arizona Court of Appeals failed to consider in totality circumstances including Doody’s youth, his lack of prior involvement with the criminal justice system, his lack of familiarity with Miranda warnings, his non-native status, the length of the interrogation with Doody seated in a straight-back chair for over nine hours without a break, the lack of adequate Miranda warnings, the tag team tactics used by the detectives, the number of interrogators, Doody’s persistent non-responsiveness, and the previous false confessions. We recognize that the Arizona Court of Appeals determined that the Miranda warnings were “clear and understandable,” Doody, 930 P.2d at 449, thereby explaining its failure to weigh that particular aspect of the interrogation. However, no apparent justification can be discerned for the failure to actually weigh, rather than simply list, the other factors that have been delineated for consideration by the United States Supreme Court. This failure of the Arizona Court of Appeals was an unreasonable application of established authority requiring consideration of the total circumstances surrounding the interrogation, and it renders the conclusion of voluntariness infirm. See Reck, 367 U.S. at 440-42, 81 S.Ct. 1541(addressing the “combination of circumstances”); see also Gallegos, 370 U.S. at 52, 82 S.Ct. 1209 (condemning intérrogators “serving in relays”).
In determining the voluntariness of a confession, “[t]he due process test takes into consideration the totality of all the surrounding circumstances — both the *1016 characteristics of the accused and the details of the interrogation---- The determination depends upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.” Dickerson, 530 U.S. at 434, 120 S.Ct. 2326(citations, alterations, and internal quotation marks omitted) (emphasis added). The required weighing of the circumstances was not performed by the state court.
The dissent’s argument notwithstanding, the jury’s voluntariness determination is not dispositive. In Jackson v. Denno, 378 U.S. 368, 390, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the Supreme Court explained:
Expanded concepts of fairness in obtaining confessions have been accompanied by a correspondingly greater complexity in determining whether an accused’s will has been overborne — facts are frequently disputed, questions of credibility are often crucial, and inferences to be drawn from established facts are often determinative. The overall determination of the voluntariness of a confession has thus become an exceedingly sensitive task, one that requires facing the issue squarely, in illuminating isolation and unbeclouded by other issues and the effect of extraneous but prejudicial evidence.
Id. at 390, 84 S.Ct. 1774 (citations omitted). Applying Jackson, the Arizona Court of Appeals has emphasized the importance of the trial court’s duty to exclude involuntary confessions, irrespective of the jury’s finding. See State v. Strayhand, 184 Ariz. 571, 911 P.2d 577, 589 n. 3 (Ariz.Ct.App.1995) (“The dissent says that even if the confessions should not have been admitted, no fundamental error occurred because the jury found that they were voluntary. The proper procedure for weighing voluntariness is set out in [Jackson ]. The threshold voluntariness inquiry is for the court and the defendant can reargue the matter to the jury. Considering Jackson ... it is clear that when it appears at any stage of the proceedings that a confession is involuntary, it is the trial judge’s duty to exclude it from, evidence.”) (emphasis added).
Our dissenting colleagues implicitly condemn Doody for not testifying at the voluntariness hearing. See Dissenting Opinion, p. 1032. However, as the Arizona state courts have held, Doody’s failure to testify does not preclude relief. See Strayhand, 911 P.2d at 589 n. 3 (“The fact that the Defendant did not testify at the voluntariness hearing does not mean that he is not entitled to relief now.”).
Relying on Juan H. v. Allen, 408 F.3d 1262 (9th Cir.2005), and United States v. Doe, 155 F.3d 1070 (9th Cir.1998) (en banc), the dissent also maintains that “[w]e have repeatedly held a suspect’s minor age and the absence of a parent do not make a confession presumptively involuntary.” Dissenting Opinion, p. 1044. Besides the fact that the majority opinion never applies any presumption of involuntariness, the cited cases are readily distinguishable. In Juan H., the defendant was properly informed of his Miranda rights, and never made any incriminating statements. See Juan H., 408 F.3d at 1272-73. Accordingly, no credible claim of involuntariness could be made. See id.
Doe is similarly inapposite. In that case, we noted that “there [was] no indication that the questioning was oppressive in any way.” Doe, 155 F.3d at 1075. Such was not the case with Doody. Indeed, the dissent concedes that the police “engag[ed] in a variety of psychologically coercive interrogating tactics.” Dissenting Opinion, p. 1045.
The amalgamated citations to Clark v. Murphy, 331 F.3d 1062 (9th Cir.2003), Jenner v. Smith, 982 F.2d 329 (8th Cir. 1993), United States v. Lehman, 468 F.2d 93 (7th Cir.1972), and United States v. *1017 Haswood, 350 F.3d 1024 (9th Cir.2003), see Dissenting Opinion, pp. 1043 — 44, are no more persuasive, as none of these cases involved a juvenile, or lengthy middle-of-the-night questioning. See Clark, 331 F.3d at 1072(questioning of an adult for five hours); Jenner, 982 F.2d at 333-34 (questioning of an adult for seven hours); Haswood, 350 F.3d at 1027-28(questioning of an adult for an undetermined amount of time that was inferred to be “all day”).
It is unclear why the dissent cites to Lehman. In that case, a dentist was questioned in his office, and the Seventh Circuit observed:
Although Lehman maintains that he felt confined and watched in his own small private office and that his will was eventually overcome by the agents’ method of questioning, he found time during this period of alleged virtual confinement to discuss his academic achievements and to recommend to one of the agents what should be done for the treatment of emphysema. Lehman was in his own suite and not in custody and could have cut off the interview at any time. He was found to be a man of intelligence, education and maturity. He was apprised of his questioners’ mission with regard to a determination of the correctness of his tax returns, and he was not completely unschooled in the implications of a tax investigation. We further note that on at least two occasions the agents asked Lehman if he wanted to leave for his golf date.
Lehman, 468 F.2d at 101 (emphasis added). The facts of that case in no way resemble the circumstances of Doody’s interrogation.
The dissent also relies on cases where the Supreme Court has addressed more extreme facts involving adults. See Dissenting Opinion, pp. 1046-47; see also Greenwald v. Wisconsin, 390 U.S. 519, 520-21, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968) (interrogation of a defendant suffering from high blood pressure and deprived of sleep, food, and medication); Darwin v. Connecticut, 391 U.S. 346, 349, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968) (forty-eight hour interrogation of a defendant who had been denied his right to counsel); Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967) (interrogation of a wounded defendant at gunpoint over five days); Clewis v. Texas, 386 U.S. 707, 709-10, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967) (nine-day interrogation with inadequate food and sleep); Davis v. North Carolina, 384 U.S. 737, 746-47, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966) (questioning over a sixteen-day period with inadequate food); and Reck v. Pate, 367 U.S. 433, 435, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961) (mentally retarded 19-year old who became ill during the interrogation). However, the Supreme Court has never suggested, let alone held, that the interrogation of a juvenile must meet some standard of extremity to render a confession involuntary. Rather, the Supreme Court has directed that we proceed with the utmost caution when considering the confession of a juvenile, being ever mindful of the “tender age” of the individual involved. In re Gault, 387 U.S. at 45, 87 S.Ct. 1428.
The dissent seeks to minimize the impact of the Supreme Court’s holding in Haley, describing this seminal case as “readily distinguishable.” Dissenting Opinion, p. 1044.
In Haley, the Supreme Court set forth the following background:
Beginning shortly after midnight this 15-year old lad was questioned by the police for about five hours. Five or six of the police questioned him in relays of one or two each. During this time no friend or counsel of the boy was present. Around 5 a.m. — after being shown al *1018 leged confessions of Lowder and Parks — the boy confessed ...
332 U.S. at 598, 68 S.Ct. 302. Despite the absence of extreme facts, the Supreme Court concluded:
The age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction ...
Id. at 600-01, 68 S.Ct. 302 (emphasis added).
The dissent does not even mention the operative facts regarding the actual interrogation in Haley:
What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child — an easy victim of the law — is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. A 15-year old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition. Mature men possibly might stand the ordeal from midnight to 5 a.m. But we cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, may not crush him. No friend stood at the side of this 15-year old boy as the police, working in relays, questioned him hour after hour, from midnight until dawn. No lawyer stood guard to make sure that the police went so far and no farther, to see to it that they stopped short of the point where he became the victim of coercion. No counsel or friend was called during the critical hours of questioning. A photographer was admitted once this lad broke and confessed. But not even a gesture towards getting a lawyer for him was ever made.
Haley, 332 U.S. at 599-600, 68 S.Ct. 302. The dissent skips over these facts in favor of several facts in Haley that occurred after the interrogation. See Dissenting Opinion, pp. 1044-45. However, in the paragraph immediately following the Supreme Court’s description of the actual interrogation, the Supreme Court observed:
This disregard of the standards of decency is underlined by the fact that he was kept incommunicado for over three days during which the lawyer retained to represent him twice tried to see him and twice was refused admission. A photographer was admitted at once; but his closest friend — his mother — was not allowed to see him for over five days after his arrest. It is said that these events are not germane to the present problem because they happened after the confession was made. But they show such a callous attitude of the police towards the safeguards which respect for ordinary standards of human relationships compels that we take with a grain of salt their present apologia that the five-hour grilling of this boy was conducted in a fair and dispassionate manner. When the police are so unmindful of these basic standards of conduct in their public dealings, their secret treatment of a 15-year old boy behind closed doors in the dead of night becomes darkly suspicious.
*1019 Haley, 332 U.S. at 600, 68 S.Ct. 302 (emphasis added). In the next paragraph, the Supreme Court applied the relevant totality of the circumstances standard:
The age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction. Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law.
Id. at 600-01, 68 S.Ct. 302 (emphasis added). Haley, therefore, is not “readily distinguishable.” Dissenting Opinion, p. 1044. Indeed, the facts of Haley are much more analogous to the circumstances faced by Doody than are the cases cited by the dissent in support of its argument.
The dissent also cites to United States ex rel. Hayward v. Johnson, 508 F.2d 322 (3d Cir.1975), Rogers v. Quarterman, 555 F.3d 483 (5th Cir.2009), Jackson v. McKee, 525 F.3d 430 (6th Cir.2008), and Hardaway v. Young, 302 F.3d 757 (7th Cir.2002), for the proposition that other circuits have also readily distinguished Haley. See Dissenting Opinion, p. 1045 n.9. A close examination of these cases reflects why they distinguished Haley, and in no way support the Arizona Court of Appeals’ ruling.
In Hayivard, the seventeen-year old defendant “was questioned on three separate occasions ... each time in a small interrogation room at the police station and each time after receiving the full Miranda warnings.... [H]e went voluntarily and with his mother’s permission each time he was questioned.” 508 F.2d at 324. The Third Circuit observed:
[W]e are troubled by the police conduct here, involving a late night questioning, without any apparent justification, of a seventeen-year old youth. We also acknowledge that the Supreme Court’s decision in [Haley], on which appellant relies, is in some respects similar to the case before us. In that case, the Supreme Court held involuntary the confession of a fifteen-year old boy who was taken from his home at night and questioned steadily from 12:00 midnight to 5:00 a.m.
Id. at 326.
However, the Third Circuit relied on the fact that the appellant never challenged the adequacy of the Miranda warnings to distinguish Hayward from Haley. See id. at 327. The Third Circuit also noted that:
the period of questioning was shorter and the manner of questioning seems less coercive. Unlike the youth in [Haley ], who gave his confession only after five hours of continuous incommunicado questioning by five or six policemen in relays of one or two each, appellant here began to give his confession early on the third occasion he was questioned, and the questioning was conducted predominantly by one person, Detective Kelly.
Furthermore, the confession was obtained only on the third occasion he was questioned. By October S, the circumstances of his questioning and the setting at the police station must have appeared less novel and intimidating; after two previous questionings he had been sent home, where he had the opportunity, unpressured by the police, to consider his situation; he was fully informed that the police were investigating his possible role in the death of William Smith; and he was surely aware that the police had twice released him without obtaining a confession. Therefore, since he had been subjected to unfamiliar surroundings on two prior occasions and yet had withstood lengthy questionings without confessing, we find *1020 it difficult to conclude that he was not acting voluntarily on October 3, when he began giving his oral incriminatory statement shortly after arriving and completed giving it within an hour and fifteen minutes of questioning. Finally, unlike the Supreme Court in Haley, we, find, no evidence of a callous disregard of appellant’s rights by the police after he gave his confession which might cast suspicion on their conduct throughout the questioning.
Id. at 327 (citation and footnote references omitted) (emphases added). Contrary to the dissent’s assertion, the Third Circuit did not distinguish Haley simply because the “suspect was informed of his right to remain silent.” Dissenting Opinion, p. 1045 n.9 (internal quotation marks omitted).
In Rogers, 555 F.3d at 485, after being informed of his rights by a magistrate, the defendant
was then taken to an interview room and left alone for a short amount of time. He was offered a soda. He was then interrogated by the officers for three to five minutes. During this time, Rogers claimed he was innocent. Anderson became frustrated and told Rogers to stop lying because his prints had been found at the crime scene. Rogers began to tear up, so he was asked if he would like to speak with a particular officer about the offense. Rogers chose Douglas, so Miller and Anderson left the room. After 30-35 minutes, Douglas exited the interview room and stated that Rogers had confessed.
Id. at 485 (emphasis added). In distinguishing Haley, the Fifth Circuit opined:
Rogers was not continuously or lengthily interrogated ... Most significantly, he was not subjected to physical abuse, mental coercion, trickery, or deceit ... The officers were truthful when they represented to Rogers that his fingerprints had been found at the scene, and there is no evidence that the officers somehow induced Rogers’s confession. Moreover, Rogers was afforded the full, extensive protections of section 51.09 of the Texas Family Code.[12]
Id. at 495 (emphases added). The safeguards present in Rogers were not available in Haley or to Doody.
In Jackson, the seventeen-year old defendant was interrogated on several occasions. The Sixth Circuit distinguished Haley:
Jackson, by contrast [to Haley], was older (17 years old); he was questioned intermittently, not continuously; he was told repeatedly of his rights to counsel and to remain silent; and no evidence shows that the officers took a callous attitude toward his rights ...
Jackson, 525 F.3d at 435 (citations omitted) (emphasis added). Because the defendant “was questioned intermittently, not continuously,” “told repeatedly of his rights to counsel and to remain silent,” and “[t]he officers’ questioning ... never exceeded two and a half hours at a time,” it is not surprising that the Sixth Circuit did not fault the state court for “declining to extend [Haley ]” to the facts. Id. at 434-35. Contrary to the dissent’s characteriza *1021 tion, the Sixth Circuit, therefore, did not distinguish Haley only on the basis that the “suspect, by contrast, was older (17 years old).” Dissenting Opinion, p. 1045 n.9.
Finally, in Hardaway, the Seventh Circuit noted:
Hardaway’s case is less egregious [than Haley’s], in that there were no efforts to keep his parents away or to confront him with false testimony, and he was held for less than one day rather than three.[13] There were also lengthy breaks in the interrogations, rather than the five grueling hours that Haley was forced to endure.
Hardaway, 302 F.3d at 763 (citations, alteration, and internal quotation marks omitted). Contrary to the dissent, the Seventh Circuit did not simply distinguish Haley because “the suspect was held for less than one day rather than three.” Dissenting Opinion, p. 1045 n.9 (internal quotation marks omitted).
Simply put, the dissent’s attempt to distinguish Haley by relying on inapposite cases from other circuits fails miserably.
The deference AEDPA requires we give to factual findings and legal conclusions from state courts does not and cannot equate to abdication of our judicial responsibilities. See Taylor, 366 F.3d at 1008 (“In passing section 2254(d)(2), Congress has reminded us that we may no more uphold such a factual determination than we may set aside reasonable state-court fact-finding. When we determine that state-court fact-finding is unreasonable, therefore, we have an obligation to set those findings aside and, if necessary, make new findings.”). We recognize and acknowledge that police officers are entitled to use, and do use, a variety of techniques to interrogate suspects. However, when those techniques overbear the will of the suspect in contravention of his constitutional rights, any confession obtained through the overbearance must be suppressed. See DeWeaver, 556 F.3d at 1002-03 (“A confession must be suppressed, even absent a Miranda violation, when the totality of the circumstances demonstrates that the confession was involuntary.”) (citation omitted).
With the utmost respect to our concur-, ring colleague, we do not view our opinion as an exercise in “yarn-spinning.” See Concurring Opinion, pp. 1024-25. Rather, we address the Arizona Court of Appeals’ unreasonable determinations, including that there was “no evidence that calls into question the testimony that Doody remained alert and responsive.” Doody, 930 P.2d at 446 (emphasis added). To uphold this determination, we would have to conclude that Doody’s claims were made from whole cloth. The record in this case forecloses such a determination, and highlights the unreasonableness of the state court’s finding that no such evidence existed.
C. Harmless Error
A coerced confession is generally not admissible evidence. See id. However, in this case, Doody’s statements confessing his involvement were admitted into evidence and considered by the jury. On habeas review, once we determine, as *1022 we discussed above, that the state court’s voluntariness determination was an unreasonable application of Supreme Court precedent, we turn to the consideration of whether the error was harmless. “Because the court of appeal[s] found the confession admissible, it did not conduct harmless-error analysis. We must therefore review the evidence at trial to determine whether the confession likely had a substantial and injurious impact on the verdict; if not, its admission was harmless.” Taylor, 366 F.3d at 1016 (citations omitted). “[T]he question is whether the erroneously admitted evidence had a substantial and injurious effect or influence in determining the jury’s verdict.” Ghent v. Woodford, 279 F.3d 1121, 1127 (9th Cm. 2002), as amended (citations and internal quotation marks omitted).
At trial, Doody argued that there was no physical evidence linking him to the temple murders; the investigation was mismanaged; the prosecutor charged three individuals, part of the Tucson Four, who had confessed to the events at the temple; the testimony of the prosecution’s key witness, Garcia, was not truthful, because he had a reason to lie given his plea agreement; and Garcia, Caratachea, and Gonzales committed the temple murders and Doody was either not involved in the temple murders at all, or was present only as a bystander.
To counter Doody’s arguments, the prosecution introduced the audiotapes of Doody’s statements. The prosecution’s reliance on the statements is evidenced by its closing arguments, which were replete with references to the audiotapes.[14] For example, the prosecution argued:
He admits, and this is tape three, page twenty-eight, and at tape nine, page thirteen, Jonathan Doody admits, ‘Me and Alex borrowed Rollie’s gun.’ Corroboration now for Rollie Caratachea’s statement to us, and also corroboration for Alex Garcia’s statements that they, in fact, did borrow that gun from Rollie. He then admits experimenting with the silencer, tape four. But later he says, tape eleven, that it was for use in the temple. The use of the silencer in the temple, very important. It shows premeditation to commit the murders, support for Alex Garcia’s statements.... He admits involvement in the temple, tape nine, page eight. He admits that he was involved in the temple crimes. The very next thing he does is he admits that this was with Alex Garcia.
Trial Transcript, July 8,1993, pp. 36-37.
In rebuttal, the prosecution also referred to Doody’s statements to support a felony murder conviction. The prosecution stated:
Let’s do it again. Go inside and let’s see what we can get. Tape eleven, pages seventeen to eighteen; tape thirteen, page thirty seven. Those are Jonathan Doody’s comments. This isn’t the State.... Mr. Doody is on trial. This is what he said. He told us this. He went back in that temple to see what he could get.... They went in there with force, and that’s armed robbery, and *1023 that’s a conviction of felony murder. Pure and simple.
Id. at 155-56.
The prosecution commented that the case was “easy because of what Jonathan Doody tells us. Alex Garcia corroborates it, gives us a lot of detail. The evidence, gives a lot of corroboration, a lot more detail. But you don’t have to go beyond Jonathan Doody’s statement ...” Id. at 156(emphasis added). Despite the dissent’s effort to catalog other evidence against Doody, the record reflects that Doody’s statements were the linchpin of the prosecution’s case.
As evidenced by the prosecution’s arguments, Doody’s statements were integral to the prosecution’s case, particularly as “the defendant’s own confession is probably the most probative and damaging evidence that can be admitted against him.” Arizona v. Fulminante, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (citations omitted). We cannot conclude that the admission of Doody’s confession was harmless error because Doody’s statements likely “had a substantial and injurious effect or influence in determining the jury’s verdict.” Ghent, 279 F.3d at 1127.

IV. CONCLUSION

We hold that the Arizona Court of Appeals’ decision constituted an unreasonable determination of the facts and an unreasonable application of the governing law to the particular facts of this case. The Arizona Court of Appeals unreasonably concluded that the Miranda warnings were clear and understandable, despite the detective’s erroneous warnings regarding Doody’s right to counsel and the use of qualifying language to downplay the warnings’ significance. Thus, we hold that under the standard of review set forth in AEDPA, Doody is entitled to a writ of habeas corpus on the ground that the Miranda warnings the police gave him were inadequate and his confession was therefore inadmissible.[15]
Additionally, the Arizona Court of Appeals’ ruling that Doody’s confession was voluntary was an unreasonable determination of the facts in light of the audiotapes that reflect the relentless, nearly thirteen-hour interrogation of a sleep-deprived juvenile by a tag team of detectives. The Arizona Court of Appeals also unreasonably applied clearly established federal law when it failed to consider the totality of the circumstances to determine if Doody’s will was overborne by the interrogation. Accordingly, we hold that under the standard of review set forth in AEDPA, Doody is entitled to a writ of habeas corpus on the ground that his confession of his involvement in the temple murders was involuntary, and therefore inadmissible.
Accordingly, we REVERSE and REMAND this case to the district court to grant Doody’s habeas petition unless the State of Arizona elects to retry Doody within a reasonable time.

. Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires that, prior to questioning, a suspect be apprised of his constitutional rights to remain silent and to consult an attorney.

. All charges against the Tucson Four were subsequently dismissed. The State has never disputed that the Tucson Four's confessions were false.

. The dissent counters that two of the panel members, who are also members of the en banc panel, held that the state court "was not *1004 objectively unreasonable in concluding the Miranda warnings were adequate ...” Dissenting Opinion, p. 1033. However, the panel opinion in no way validated the Miranda warnings given to Doody. See Doody, 548 F.3d at 862-63 (noting that the Miranda warnings given “did little to actually inform [Doody] of his rights.”). In any event, arguments before the en banc court elucidated the unlawfulness of the warnings and the unreasonableness of the state court decision to the contrary.

. The dissent halfheartedly cites Cooper v. Dupnik, 963 F.2d 1220 (9th Cir.1992), overruled by Chavez v. Martinez, 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003), as a favorable comparative to Detective Riley's downplaying of the Miranda warnings. See Dissenting Opinion, pp. 1040-41. In Cooper, the officer admitted that he wanted the subject to perceive the Miranda warnings as a joke. See Cooper, 963 F.2d at 1228. However, the facts in Cooper are not that different. The only thing missing in this case is an admission from the detective.

. We think it prudent to note that the Supreme Court expressly prefaced its ruling in Richter with the statement that the issue it decided was whether the standard articulated in 28 U.S.C. § 2254(d) was "adhered to ... in this case as it relates to ineffective-assistance claims judged by the standard set forth in Strickland ...” Richter, 131 S.Ct. at 780. In its analysis, the Supreme Court focused on the triple deference applicable — for habeas review, for the general rule articulated in Strickland, and for the deference to counsel’s representation. See id. at 788. No such triple deference is applicable in a Miranda case, which addresses simply whether officers provided four specific warnings, as is required by the Supreme Court’s clearly established precedent. Those four warnings were indisputably not given to Doody.

. The dissent "presumes” that some of the sixteen Arizona factfinders were fairminded. Dissenting Opinion, pp. 1049-50 (emphasis added). However, if "presumed” fairmindedness were the standard, relief under AEDPA would be nonexistent. Indeed, the Supreme Court instructed in Richter that the standard is whether “the state court’s ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement.” Richter, 131 S.Ct. at 786-87. The emphasis is clearly on application of law rather than on counting noses.

.Our dissenting colleagues dismiss our discussion of the voluntariness of Doody's confession as gratuitous. See Dissenting Opinion, p. 1041. To the contrary, voluntariness is a separate and independent ground for reversal of the Arizona Court of Appeals’ ruling, although the voluntariness argument also provides additional support for our conclusion *1008 regarding the inadequacy of the Miranda warnings Doody received. See Withrow v. Williams, 507 U.S. 680, 693-94, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (discussing the interrelatedness of the voluntariness and Miranda inquiries).

. The dissent concedes that “the state court did not describe the physical surroundings” of the interrogation. Dissenting Opinion, p. 1043 n. 7. In an effort to fill this void, the dissent describes the physical surroundings as "what had been the office of a Maricopa County attorney, roughly ten feet by eighteen feet in size, well-lit, with carpeted floors and padded chairs ...” Id. The dissent completely fails to mention that the chair where Doody was seated had a straight, immobile back. There was no table or desk on which Doody could lean or rest his head. For almost thirteen hours, Doody was required to sit completely upright while being interrogated by a tag team of officers.

. Although our dissenting colleagues attempt to minimize the import of the false confessions, see Dissenting Opinion, p. 1048 n.ll, they cannot deny their existence.

. Contrary to the dissent's implication, see Dissenting Opinion, p. 1049, members of the Arizona courts were not the only judges who “listened to the tapes in toto."

. This tale of the tape completely refutes the dissent’s characterization of Doody as "almost chatty in the last several hours of the interrogation.” Dissenting Opinion, p. 1047 n. 10.

. Texas Family Code § 51.06 provided:
Unless a contrary intent clearly appears elsewhere in this title, any right granted to a child by this title or by the constitution or laws of this state or the United States may be waived in proceedings under this title if: (1) the waiver is made by the child and the attorney for the child; (2) the child and the attorney waiving the right are informed of and understand the right and the possible consequences of waiving it; (3) the waiver is voluntary; and (4) the waiver is made in writing or in court proceedings that are recorded.

. Although the dissent relies on this statement that the defendant "was held for less than one day rather than three,” to distinguish Haley from Doody, Dissenting Opinion, p. 1045 n. 9, it is important to remember that the holding of Haley for three days occurred after his interrogation. See Haley, 332 U.S. at 600, 68 S.Ct. 302. It is unclear why the dissent implies that three days in custody is somehow a temporal benchmark for whether a confession is involuntary, particularly as the Supreme Court emphasized that Haley was "questioned through the dead of night by relays of police ... from midnight to 5 a.m.” Id. at 599, 68 S.Ct. 302.

. The dissent simultaneously scolds us for reciting the audiotapes at length and for "leav[ing] key sentences, exchanges, and pages of transcript unaccounted for.” Dissenting Opinion, p. 1049. Yet, the dissent does not give one concrete example of omitted information from the audiotapes that would redeem this interrogation. Because the audiotapes highlight the unreasonableness of the state court’s findings, it is completely understandable that the dissenters would prefer that these audiotapes not see the light of day.

. Our dissenting colleagues’ early reference to the recent Supreme Court decision of McDaniel v. Brown, -U.S. -, 130 S.Ct. 665, 175 L.Ed.2d 582 (2010), see Dissenting Opinion, pp. 1029-30, is puzzling. Brown involved this court’s application of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) in resolving a sufficiency-of-evidence challenge. See Brown, 130 S.Ct. at 667("We granted certiorari to consider whether [the District Court and Court of Appeals] misapplied Jackson."). The discussion of § 2254(d)(1) was made in the context of our described failure to “review the evidence in the light most favorable to the prosecution” as required by Jackson. Id. at 673(citation and internal quotation marks omitted). In contrast, this case concerns review of the adequacy of a Miranda warning and the voluntariness of a confession, neither of which is governed by the Jackson directive to view all evidence in the light most favorable to the prosecution.