Filed 1/23/14  P. v. Gray CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B241226 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. NA089033) |
| MEGHAN GRAY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Arthur Jean Jr., Judge.  Affirmed.

Rachel Lederman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

Because of a traffic violation, officers stopped a car in which defendant and appellant Meghan Gray was a passenger. Defendant had drugs and she admitted she was on parole. Because she was on parole, defendant's motel room was searched, and it contained stolen property. According to investigating officers, defendant waived her *Miranda*[1] rights and gave statements leading them to evidence linking her to recent burglaries. Defendant's motion to suppress her statements and the evidence on the ground her statements were involuntary was denied. She contends that the motion should have been granted because, first, the traffic stop violated the Fourth Amendment, and, second, her statements resulted from a coercive interrogation. We reject these contentions and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.      Factual background.**

   A.     *The traffic stop.*

On May 20, 2011, at about 2:30 a.m., Long Beach Police Officers Ron Martin[2] (Officer Ron) and Derek Ernest were patrolling in their police vehicle. There was light traffic. A Mustang driven by Adrian Villanueva turned into an alley without signaling. There was no oncoming traffic when the car turned, but the officers, who were approximately 50 to 60 feet behind Villanueva, had to slow down briefly. The car then turned onto a street, again failing to signal. When Villanueva made the second unsignaled turn, the officers did not know whether there were any vehicles nearby.

The officers stopped the car. Villanueva did not have identification. Ernest asked defendant, the front seat passenger, for identification. Ron ran a "want and a warrant inquiry" that showed that defendant was on parole for selling narcotics. Defendant admitted she had parole conditions.

---

[1]      *Miranda v. Arizona* (1966) 384 U.S. 436.

[2]      Although the officer was at times referred to as Officer Ron, he stated his name was Ron Martin.

2

She and the driver were told to get out of the car, and Ernest found a glass pipe (a device used to smoke methamphetamine) on the floorboard where defendant had been sitting. A female officer found $48 in defendant's bra area. Defendant pulled from her jeans a bag containing 11 plastic baggies filled with what appeared to be methamphetamine. She also had a black bag containing four capsules filled with a white substance.

Ron found a motel key in defendant's purse. Defendant said a stolen Mustang was parked at the motel. Based on the key and defendant's statement, officers were dispatched to the motel to conduct a parole search.[3] Officers found a car registration slip in the name of Randa Garrana, whose residence on Toledo Street had been burglarized. Officers also found electronics, sporting equipment, and other property.

At no time did Ron offer leniency to defendant.

B.     *Subsequent questioning of defendant at the police station.*

Meanwhile, defendant, who wanted to cooperate, was taken to the police station at about 3:30 a.m. When she mentioned fumigation tent burglaries and stolen cars,[4] Officer John Gibbs, who had known defendant for several years, read *Miranda* rights to her. She waived her *Miranda* rights, and they talked for over an hour, until about 6:00 a.m. She was not handcuffed and the officers' guns were not drawn during this time. Gibbs did not threaten or yell at her or make an offer of leniency or say that if she gave them information she would not be charged with drug crimes. Their conversation was professional, even jovial at times. During the time he was with defendant from about 3:00 a.m. to 9:00 a.m., Gibbs did not see her sleep, but he was not in constant visual contact with her.

Between 6:00 a.m. and 7:00 a.m., defendant was taken to the motel where she'd been staying. She dozed off and on in a chair. Burglary Detective Jose Yarruhs arrived

---

[3]     Defendant also said that the officers could search the room, and she later signed a consent form to search the room.

[4]     During the interview, defendant mentioned the burglary on Toledo Street on April 26, 2011 and her drug connections.

at the motel at about 7:00 a.m.  Defendant told him that she'd received her *Miranda* rights but wanted to talk to him.  She showed the detective a car registration slip for an Infiniti, and he recognized the owner, Garrana, as a burglary victim who lived on Toledo Street in Pasadena.  Defendant said that she and her boyfriend took a safe, jewelry, and commemorative coins to Eric Lloyd, who gave them $200 in exchange for the items.  Yarruhs and defendant talked for about an hour to an hour and a half, during which time defendant had nothing to eat and did not sleep.  During the time Yarruhs and defendant were together, she was friendly and nice.  Yarruhs gave her no promises or deals and did not threaten her.  At some point, defendant told Yarruhs she was pregnant.

So that defendant could direct them to stolen property, Long Beach Police Officer Joel Camrin picked defendant up from the motel, and she directed him to an apartment building and a house in Long Beach.  They were together two to four hours, from about 8:00 a.m. to 12:00 p.m.  She slept on the way to Pasadena, and they stopped to get water.  He never threatened or made her promises.

Yarruhs next saw defendant at about 1:00 p.m. at the Long Beach police station, and they talked for about two hours.  While there, defendant saw her boyfriend.  Defendant told Yarruhs that she acted as a lookout while her boyfriend went inside Garrana's house, which was being fumigated

Officer Jennifer Valenzuela first saw defendant at the police station around 4:00 p.m.  Defendant was friendly and talkative.  During the two hours Valenzuela was at the station, she never heard defendant ask to use the bathroom.  Defendant was not denied water or food.  Valenzuela did not promise leniency.  Defendant did say she was pregnant.

Valenzuela took defendant to the residence on Toledo that had been burglarized.  Defendant ate at a Taco Bell before going to a second residence on the west side of Long Beach where defendant thought some stolen items might be.  They returned to the police station sometime between 6:00 p.m. and 7:00 p.m.  Defendant was booked that evening at about 8:00 p.m.

4

Out on bail, defendant called Yarruhs in June or July to tell him about another crime. She directed him to a residence in Glendora where he found, among other things, computers belonging to Garrana.

C.     *Defendant's testimony.*

When defendant was stopped at 2:30 a.m., she had just gotten off an eight-hour shift at work and was tired. At the traffic stop, she gave identification to an officer, who after going to the patrol car with the identification, asked if she was on parole. She said she was, and she allowed the officers to search her purse but not the car. After she was told that if she was found with drugs at the police station she would be charged with bringing drugs into a jail, she admitted she had drugs on her. Ron said she could go home if she told them where the drugs came from. She was never *Mirandized* in the field.

Defendant was taken to the police station around 3:30 a.m., where Ron told her she could go home if she spoke with other officers. Gibbs also promised to let her go if she gave him something to work with. Gibbs did not read her *Miranda* rights. They talked about burglaries, including fumigation tent burglaries, stolen cars, and controlled substances. She was never told she was a burglary suspect. Tired and upset, she wanted to go home. She mentioned wanting food, but she was not fed. She asked whether once they got to the motel room and she spoke to the officers there, would she be done, but the officers didn't know. Neither Gibbs nor any other officer told her she couldn't have food or water or take a break. Gibbs never threatened her physically. The tone was conversational.

After her conversation with Gibbs, defendant was taken to the motel room, where she was shown a pink slip, but she didn't know where it came from. She dozed in a chair, although she would be awakened with questions. Having not eaten, at 6:00 a.m., she ate cereal in the motel room. She did not eat again until that evening, when an officer took her to Taco Bell.

When Yarruhs arrived at the motel, he did not ask whether she had been given her *Miranda* rights. He only briefly questioned her, during which time he made no promises

5

and did not physically threaten her. No officer denied her food or water, a bathroom break or sleep or promised her leniency while she was at the motel.

She agreed to help officers find the homes of people her boyfriend did business with in the hope she would be allowed to leave. Although Camrin told her that he didn't know what would happen after she showed them the locations, she assumed she would be allowed to leave. While Camrin drove her to two locations, one in Long Beach and the second in Pasadena, she slept on and off. He did not get her water. He did not promise her leniency or threaten her. The tone of their conversation was friendly.

When she returned to the station, Yarruhs questioned her again. Yarruhs did not continuously question her; he would come in and out of the conference room, and she would put her head down and rest her eyes. Yarruhs told her that if she helped recover the victim's property, charges would be dropped and she could go home. When she asked when she would be done, they kept telling her "in a few minutes" and that she could go home once she finished answering questions. When she mentioned she had to be at work at 5:00 p.m., they told her she would make it. But she fell asleep at the table, and when she woke up it was too late to get to work on time. She was tired and wanted "to get it over and done with." She was still not told she was a burglary suspect.

Valenzuela got her food from Taco Bell after they left the Toledo location. Defendant then tried to help Valenzuela find Shannon Dugan's house, because Dugan was involved in the robberies. She and Valenzuela never discussed leniency. When she returned to the station after trying to locate Dugan, she was told she wasn't going home. Valenzuela said that the lieutenant on the case was unhappy with the results of what defendant had provided and that she would be arrested for residential burglary. Valenzuela told defendant not to "freak out," that she would try to get it cleared up but that defendant would have to be arrested and booked.

Defendant got out of jail on bail on June 3, 2011. She called Yarruhs in June or July to get her property back, but when he asked if she knew where the stolen items were, she said she could help them out. Because he said they would try to get the outstanding case against her cleared up, she helped him to find Dugan.

6

## II. Procedural background.

An information filed on July 21, 2011 alleged count 1 for first degree residential burglary (Pen. Code, § 459).[5] It also alleged that defendant had prior convictions within the meaning of section 667.5, subdivision (b).

Defendant filed a motion to suppress her statements. After a multiple-day hearing, the trial court denied the motion. The court first found that the traffic stop was lawful, because the officers' car was affected by the driver's failure to signal. The officers could ask defendant for her identification, because questions about a person's identity do not implicate the Fourth Amendment. The court also found defendant not to be credible. The court concluded that she was given her *Miranda* rights and was not promised any consideration for cooperation in the case. Her statements were therefore voluntary.

On April 18, 2012, defendant pled no contest to first degree burglary (§ 459). On May 14, 2012, the trial court sentenced her to two years in prison.

## DISCUSSION

## I. The traffic stop did not violate the Fourth Amendment.

Defendant contends that the traffic stop violated the Fourth Amendment, because the failure to signal did not violate Vehicle Code section 22107; hence, her statements and the evidence in the motel room and other locations should have been suppressed. We disagree.

The Fourth Amendment guarantees the right to be free of unreasonable searches and seizures by law enforcement personnel. (U.S. Const., 4th Amend.; *People v. Diaz* (2011) 51 Cal.4th 84, 90.) Subject to " 'well-delineated exceptions,' " warrantless searches are presumed to be unreasonable. (*Diaz*, at p. 90; see also *People v. Rogers* (2009) 46 Cal.4th 1136, 1156.) The protections guaranteed by the Fourth Amendment extend to brief investigatory stops of people and vehicles that fall short of traditional arrest. (*People v. Butler* (2003) 111 Cal.App.4th 150, 160.)

---

[5] All further undesignated statutory references are to the Penal Code.

7

The government bears the burden of demonstrating a legal justification for a warrantless search.  (*People v. Evans* (2011) 200 Cal.App.4th 735, 742; *People v. Rogers*, *supra,* 46 Cal.4th at p. 1156.)**6**  We evaluate challenges to the admissibility of a search or seizure solely under the Fourth Amendment.  (*People v. Carter* (2005) 36 Cal.4th 1114, 1141.)  When reviewing the denial of a suppression motion, we defer to the trial court's express or implied factual findings if supported by substantial evidence, but exercise our independent judgment to determine whether, on the facts found, the search or seizure was reasonable under the Fourth Amendment.  (*People v. Lomax, supra*, 49 Cal.4th at p. 563.)

A " 'detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity.' [Citation.]" (*People v. Logsdon* (2008) 164 Cal.App.4th 741, 744; see also *People v. Carmona* (2011) 195 Cal.App.4th 1385, 1390.)  " 'As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.' [Citation.]" (*People v. Lomax, supra*, 49 Cal.4th at p. 564; see also *Whren v. United States* (1996) 517 U.S. 806, 810.)**7**

Here, Officers Ron and Ernest testified that they stopped Villanueva's car because he violated Vehicle Code section 22107, which provides:  "No person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the

---

**6** If there is a legitimate reason for a search or seizure, an officer's subjective motivation is generally irrelevant.  (*Kentucky v. King* (2011) ___ U.S. ___ [131 S.Ct. 1849, 1859] [the high court's cases " 'have repeatedly rejected' a subjective approach, asking only whether 'the circumstances, viewed *objectively*, justify the action' "]; *People v. Lomax* (2010) 49 Cal.4th 530, 564.)

**7** "Once a vehicle has been detained in a valid traffic stop, police officers may order the driver *and passengers* out of the car pending completion of the stop without violating the Fourth Amendment."  (*People v. Lomax, supra*, 49 Cal.4th at p. 564; see also *Pennsylvania v. Mimms* (1977) 434 U.S. 106, 111.)

manner provided in this chapter *in the event any other vehicle may be affected by the movement*." (Italics added; see also *People v. Carmona, supra,* 195 Cal.App.4th at p. 1390; *People v. Logsdon, supra,* 164 Cal.App.4th at p. 743 & fn. 3.) In *Carmona*, an officer was driving southbound. (*Carmona*, at p. 1388.) The defendant was driving northbound on the same street when he made a right turn without signaling. The officer stopped the defendant for violating Vehicle Code section 22107. The officer, however, conceded that the defendant's turn did not affect him because the officer was travelling in the opposite direction, was at least 55 feet from the defendant, and no other cars were around. (*Carmona*, at p. 1390; see also *U.S. v. Mariscal* (9th Cir. 2002) 285 F.3d 1127, 1131-1132 [no violation of Arizona's equivalent to Vehicle Code section 22107 where police car was at a standstill on the other side of the street from where the defendant made a turn without signaling].) The traffic stop was therefore unreasonable under the Fourth Amendment, and the defendant's suppression motion should have been granted.[8]

Still, a signal is primarily aimed at vehicles behind the car changing lanes. (*People v. Miranda* (1993) 17 Cal.App.4th 917, 930.) And a vehicle may be "affected" by another vehicle's lane change even if no actual impact occurs. (*People v. Logsdon, supra,* 164 Cal.App.4th at p. 745.) *Logsdon* found that the defendant's unsignaled turn affected the officer driving behind him, even though the officer was estimated to be within 100 feet of the defendant's vehicle. (*Id.* at pp. 745-746.) *Logsdon* therefore held that the traffic stop did not violate the Fourth Amendment.

The facts here, while similar, are more compelling than those in *Logsdon*. *Logsdon* assumed that the officer was affected by the defendant's failure to signal before turning, because the officer was within 100 feet of the defendant's vehicle. Here, Officer Ron directly testified about the effect Villanueva's turn had on him. When Villanueva

---

[8]     *Carmona* also rejected the argument that the stop could be justified under Vehicle Code section 22108, which provides that an intent to turn must be signaled during the last 100 feet traveled by the vehicle before turning. (*People v. Carmona, supra,* 195 Cal.App.4th at pp. 1391-1394 ["reading sections 22107 and 22108 together, a motorist must continuously signal during the last 100 feet traveled before turning, but only in the event other motorists may be affected"].)

made his first unsignaled turn, the officers were in their car, approximately 50 to 60 feet behind him. Officer Ron testified: "I had to slow down briefly when she made a westbound turn, []cause I was driving at the speed limit, 25, but approximately 50 to 60 away. It was a quick, left turn without signaling, so I had no idea the vehicle was going to turn." Thus, in contrast to *Carmona* and *Logsdon*, Officer Ron had to slow down as a result of defendant's failure to signal.

The suppression motion was therefore properly denied.[9]

## II. The voluntariness of defendant's statements.

Defendant next contends that the suppression motion should have been granted on a second ground: her statements were involuntary "because she was subjected to a coercive interrogation process in which, pregnant, she was deprived of sleep and food for an extended period of time while relentlessly questioned by multiple officers."

An involuntary confession—one that is not free because the defendant's will was overborne—is inadmissible at trial under the due process guarantees of the United States and California Constitutions. (*Mincey v. Arizona* (1978) 437 U.S. 385, 398; *People v. Massie* (1998) 19 Cal.4th 550, 576; *People v. Smith* (2007) 40 Cal.4th 483, 501.) A confession is involuntary when elicited by a promise of some benefit or leniency, whether express or implied, and the wrongful inducement and the defendant's statements are causally linked. (*People v. Holloway* (2004) 33 Cal.4th 96, 115; *People v. Maury* (2003) 30 Cal.4th 342, 404-405; *Colorado v. Connelly* (1986) 479 U.S. 157, 164, fn. 2.) When the defendant is given to understand that he or she might reasonably expect more lenient treatment at the hands of the police, prosecution, or the courts, in consideration of making a statement, even a truthful one, the inducement may render any ensuing statement by the defendant involuntary and, thus, inadmissible. (*Holloway*, at p. 115.)

---

[9] Because we find that the search and seizure was proper on this ground, we do not address the People's additional argument that the search was proper because the officers knew, before searching her, that defendant was on parole and subject to search without a warrant.

10

The voluntariness of a suspect's statement is determined based on the totality of the circumstances. Those circumstances include " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' " (*People v. Williams* (1997) 16 Cal.4th 635, 660.) Questioning by the police may include exchanges of information, summaries of evidence, an outline of theories of events, confrontation with contradictory facts, debate, and even exaggerated statements implying that the police have more knowledge about a crime than they actually possess. (*People v. Holloway, supra*, 33 Cal.4th at p. 115; see also *People v. Jones* (1998) 17 Cal.4th 279, 299.) Only those "psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable" are inadmissible. (*People v. Ray* (1996) 13 Cal.4th 313, 340.)

"In order to introduce a defendant's statement into evidence, the People must prove by a preponderance of the evidence that the statement was voluntary. [Citation.] If a statement is found to be involuntary, the statement and other evidence derived from it are inadmissible for any purpose." (*People v. Vasila* (1995) 38 Cal.App.4th 865, 873.) We accept "the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained." (*People v. Smith, supra*, 40 Cal.4th at p. 502.)

Defendant makes two main arguments concerning the voluntariness of her statements. First, she was promised a deal or leniency in exchange for her statements. Second, she was questioned for approximately 18 hours, while pregnant, without food or sleep.

As to defendant's first argument, defendant testified that Officers Ron, Yarruhs, and Gibbs promised her a deal or leniency if she helped them with the burglary and drug investigations. Defendant additionally denied being given her *Miranda* rights. The officers, however, denied making any promises or offers of leniency. Gibbs also testified

11

that he read *Miranda* rights to her when she arrived at the station in the early morning and that she waived her rights. Yarruhs, who first met defendant at the motel around 6:00 a.m. or 7:00 a.m., asked defendant whether she had been given her *Miranda* rights. She said she had, but she wanted to talk to him.

The trial court found defendant not to be credible: "So it really does come back to credibility call. [¶] And based on [defendant's] testimony, I don't find her testimony to be credible. And let me tell you why. [¶] She tells the court during her testimony that she was promised leniency. . . . [¶] Her testimony is that at no time she was advised of her *Miranda* rights and . . . she was at least on three separate occasions promised leniency if she cooperated with police officers. [¶] . . . [¶] Yet, her testimony is that she had absolutely no knowledge of what happened at Toledo. Every information that she received was from officers, who had given her information about the Toledo burglary. [¶] Her testimony is not credible. [¶] Therefore, on credibility call, I don't believe that she was not provided her *Miranda* rights. She was. [¶] And I don't believe that she was given promissory considerations for her cooperation, because she was arrested on the night of this incident."

"Our role in reviewing the resolution of this issue is limited. The question of the voluntariness of the consent is to be determined in the first instance by the trier of fact; and in that stage of the process, '[t]he power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence.' [Citations.]" (*People v. James* (1977) 19 Cal.3d 99, 107.) Thus, where, as here, substantial evidence supports the trial court's credibility determination, we must accept it.

Next, defendant argues that the length of time she was in custody before she was booked, approximately 18 hours, from 3:30 a.m. to 8:00 p.m., was unduly lengthy and therefore coercive. There is, however, no specific time limit on an interrogation; rather, length of the interrogation is just one factor in the totality of the circumstances. (See

12

*People v. Hill* (1992) 3 Cal.4th 959, 981, overruled in part on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) In *Hill*, the defendant was interrogated for approximately eight hours in five separate sessions over a 12-hour period. (*Hill,* at p. 981.) The court found that the defendant's statements given during the interrogation were voluntary. The actual interrogation, which took place during normal waking hours, was not continuous; it was divided into five sessions punctuated by breaks "not of insignificant duration." (*Ibid.*) The defendant also was promptly provided with food, drink, and restroom breaks when requested. (*Ibid.*; cf. *Ashcraft v. Tennessee* (1944) 322 U.S. 143, 153 [statements of a suspect interrogated for 36 hours without sleep or rest by a relay team of officers and attorneys were involuntary]; *Clewis v. Texas* (1967) 386 U.S. 707, 712 [suspect's statements were inadmissible because of "concern as to the extent to which petitioner's faculties were impaired by inadequate sleep and food, sickness, and long subjection to police custody with little or no contact with anyone other than police"]; *Doody v. Ryan* (2011) 649 F.3d 986, 990 [2011 U.S. App. LEXIS 9102] [statements of a 17-year-old boy were involuntary where he was held for almost 13 hours and subjected to "relentless overnight questioning" by a "tag team of officers"].)

Although defendant here was in police custody for a lengthy period of time before being booked, the actual interrogation was not continuous, was divided into sessions, and defendant slept and ate between some sessions. Although the record is inexact, it appears that defendant was first questioned at the police station from about 3:30 a.m. to 6:00 a.m. She was then taken to the motel, where she ate cereal and dozed, for how long it is unclear. Yarruhs talked to defendant for an hour to an hour and a half at the motel. Camrin picked defendant up from the motel and she directed him to various locations relevant to the burglary investigations. Defendant slept in the car, and the detective gave water to her. They were together two to four hours, from about 8:00 a.m. to 12:00 p.m. At about 1:00 p.m., defendant saw Yarruhs again at the station, and they talked for about two hours, although this was not a continuous session because defendant was allowed to visit her boyfriend, who was also in custody. Later that afternoon, it is unclear what time, Valenzuela drove with defendant to one of the burgled residences, after which defendant

13

ate food from Taco Bell. They returned to the station sometime between 6:00 p.m. and 7:00 p.m., and defendant was booked at about 8:00 p.m.

Defendant corroborated much of these events. She conceded that no officer denied her food or water, a bathroom break or sleep at the motel. She also said that she slept off and on while Camrin drove her to various locations. Back at the station that afternoon, Yarruhs questioned her, but it was not continuous; he came in and out of the room, and she would put her head down and rest her eyes or sleep. That evening, Valenzuela got defendant food from Taco Bell.

From this evidence, it appears that although defendant was in custody from about 3:30 a.m. to 8:00 p.m., when she was booked, she was not interrogated or questioned for longer than approximately two hours at a time. In between these sessions, she was allowed to rest or to sleep. She was even allowed to see her boyfriend. Also, she was not at the police station the entire time; she spent some of the time at her motel and some driving with officers to locations in Long Beach and in Pasadena. She had breakfast and a meal later in the afternoon, and she conceded she was not denied bathroom breaks.

In addition, defendant, who was 24 at the time of the offense, had prior experience with the law. She admitted that she had been read *Miranda* rights before and that she'd learned about *Miranda* in high school. Also, Gibbs testified that he knew her from prior contacts, and they were friendly with each other. Defendant agreed that many of the officers were friendly and professional. The totality of these circumstances demonstrate that, despite the length of time defendant was in police custody, her statements were voluntary. (See, e.g., *People v. Anderson* (1990) 52 Cal.3d 453, 470 [although the defendant said he'd been awake 30 hours before confessing, the totality of the circumstances, including his age (27), high IQ, and his "reflective actions during the course of the offenses," "afford[ed] [an] insufficient basis for overturning the trial court's finding of voluntariness"].)

14

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


KLEIN, P. J.


CROSKEY, J.

15